UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LASANDRA HILLSON,
STEVEN BOHLER, and
ASHLEY SCHMIDT,
*individually and as proposed representatives
of a class*,

   Plaintiffs,

v.

KELLY SERVICES INC.,

   Defendant.

Case No. 2:15-cv-10803
Honorable Laurie J. Michelson
Magistrate Judge Anthony P. Patti

---

## OPINION AND ORDER PRELIMINARILY APPROVING SETTLEMENT AGREEMENT AND PRELIMINARILY CERTIFYING SETTLEMENT CLASS

Plaintiffs Lasandra Hillson, Steven Bohler, and Ashley Schmidt claim that Defendant Kelly Services, Inc. violated the Fair Credit Reporting Act. When Plaintiffs applied for jobs Kelly offered, they received a form disclosing that Kelly might run a background check to assess their employability. But, say Plaintiffs, this form included additional information that violated the FCRA's requirement that the disclosure be in a stand-alone document. Plaintiffs also maintain that there are about 220,000 individuals who received a virtually identical disclosure form when they applied for Kelly jobs. Plaintiffs seek to represent this class of individuals.

Following some formal discovery, two mediation sessions (with two retired federal judges), and additional negotiations, Plaintiffs and Kelly have settled their dispute. As the parties' settlement would bind not only them but any of the 220,000 individuals who do not opt out, the law requires this Court to both certify the proposed class and determine that the settlement is fair to the class. As a first step, Plaintiffs ask this Court to preliminarily certify the

class for settlement purposes and to preliminarily approve the settlement. (R. 37.) Kelly does not oppose Plaintiffs' motion. (*See* R. 37.) Having studied the briefing and associated law, and having heard oral argument, the Court preliminarily finds that the parties' settlement is fair and preliminarily certifies Plaintiffs' proposed class.

## I.

## A.

In 2012 and 2013, Plaintiffs Hillson, Bohler, and Schmidt each applied for a job offered by Defendant Kelly Services. (R. 2, PID 22–24.) Their application packets included a document titled "Background Screening Notice, Disclosure, and Authorization." (R. 2, PID 23.)

As its name suggests, the form included a disclosure and sought the applicant's authorization. Regarding the disclosure, the form read in part, "Kelly may request consumer reports and/or investigative consumer reports (collectively 'consumer reports') in connection with my application for employment or at any time during my employment in accordance with all applicable laws. These reports may include information bearing on my character, general reputation, personal characteristics or mode of living." (R. 2, PID 32.) As for the authorization, the form stated: "I have read this *Background Screening Notice, Disclosure, and Authorization,* I understand it, and I agree to its terms." (*See* R. 2, PID 32.)

Although the disclosure and authorization comprised the bulk of the one-page form, the form included two additional sentences. (*See* R. 2, PID 32.) One was a waiver: "To the fullest extent permitted by law, I release Kelly, its employees, agents, successor and assigns, from any and all claims, actions or liability whatsoever that are in any way related to the procurement of a consumer report about me, or any subsequent investigation(s) of my background or personal history." (R. 2, PID 32.) The other was a disclaimer: "I understand that this Authorization is not

a contract for continued employment and does not alter the at-will nature of my employment or offered employment." (*Id.*)

Hillson, Bohler, and Schmidt claim that the inclusion of the waiver and disclaimer on the disclosure form violated the following provision of the Fair Credit Reporting Act:

> [A] person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless . . . a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, *in a document that consists solely of the disclosure*, that a consumer report may be obtained for employment purposes . . . .

15 U.S.C. § 1681b(b)(2)(A)(i) (emphasis added). The emphasized language is commonly known as the "stand-alone disclosure" requirement. It is Plaintiffs' position that while both the notice and authorization could be included in the same document, *see* § 1681b(b)(2)(A)(ii), the stand-alone disclosure requirement prohibited the inclusion of the waiver and disclaimer. (R. 2, PID 23–24, 28.)

Accordingly, Plaintiffs filed this lawsuit on behalf of themselves and about 220,000 others asserting a claim that Kelly violated § 1681b(b)(2)(A)(i). (*See* R. 2, PID 23, 28.)

Since that time, the parties have worked toward settlement. And in June 2016, Plaintiffs filed an unopposed motion for this Court to (1) preliminarily approve the parties' settlement and to (2) preliminarily certify their proposed class for settlement purposes. (R. 37.)

**B.**

Although Plaintiffs' proposed class and the parties' settlement agreement will be discussed in detail below, a brief outline is useful at this point.

Plaintiffs seek to represent a class of about 220,000 individuals who were hired when Kelly was using a disclosure form that included a waiver and for whom, between July 18, 2012 and January 23, 2014, Kelly obtained a consumer report. (*See* R. 37, PID 519.) Although the

3

parties do not propose subclasses, their settlement effectively divides members of this class into two groups. For approximately 180,000 potential class members, Kelly ran a background check and assigned the potential member a "favorable" rating. (*See* R. 37, PID 514.) But for the remaining 40,000 (or so) potential class members, Kelly assigned a rating other than favorable. (*Id.*) The parties' settlement agreement contemplates awarding these "Adjudicated Ineligible" class members three times as much as the favorably rated class members. (R. 37, PID 521.)

Under the settlement agreement, Kelly will provide Plaintiffs and the proposed class with several benefits. The primary one is that Kelly will create a settlement fund of $6,749,000, none of which will revert to Kelly. (R. 37, PID 520, 522.) Of this fund, it is contemplated that up to 33% (approximately $2,250,000) will go to class counsel for fees. (*See* R. 37, PID 521.) Administrative expenses (about $330,000) and incentive awards to Plaintiffs ($2,500 each) will also be deducted from the fund. (*See* R. 37, PID 522.)[1] After all these deductions, the payout, assuming all 220,000 potential class members make a claim, will be about $41 for an Adjudicated Ineligible class member and about $14 for those who received a favorable rating. In addition, Kelly has agreed to remove the waiver and disclaimer language from its disclosure forms for a period of five years and to provide, upon request, each class member (and Kelly temporary employees) a copy of the consumer report that Kelly obtained. (R. 37, PID 520.)

In exchange for these benefits, Kelly will receive a release of claims. In particular, the parties propose that those class members who do not opt out of the settlement will forever release any and all claims "arising out of or relating directly or indirectly in any manner whatsoever to the facts alleged or asserted in the Complaint and Amended Complaint and which relate directly

---

[1] Although the settlement agreement provides that administration expenses will be about $293,000, the Court has suggested changes to the content of the notices which will increase administration expenses by about $38,000. (*See* R. 49, PID 752.)

or indirectly in any manner whatsoever to Defendant's procurement of consumer reports, including but not limited to any and all claims under 15 U.S.C. §§ 1681b(b)(1), 1681b(b)(2) and 1681b(f) of the Fair Credit Reporting Act and any analogous state law claims." (R. 49, PID 776–77.)

## II.

Before addressing whether the settlement is fair and whether the proposed class should be certified, the Court must decide whether it has subject-matter jurisdiction over the claim Plaintiffs assert. Following the Supreme Court's recent decision in *Spokeo, Inc. v. Robins*, — U.S. —, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016), this is a close question.

Article III of the U.S. Constitution limits the jurisdiction of the federal courts to "cases" and "controversies." For there to be a constitutional case or controversy, it must be that the plaintiff has standing to sue. *See Spokeo*, 136 S. Ct. at 1547. And for a plaintiff to have standing, it must be that she suffered an "injury in fact." *Id.* That jurisdictional requirement in turn requires that her injury be "particularized" and—as relevant here—"concrete." *Id.*

In *Spokeo*, the Supreme Court provided guidance on what types of injuries are "concrete" enough to give rise to an Article III controversy. There, Spokeo, Inc. operated a website that allowed "users to search for information about other individuals." *Id.* at 1546. At some point, a user ran a search on Thomas Robins and the website returned inaccurate (but arguably positive) information about Robins. *Id.* Robins sued, claiming, among other things, that Spokeo violated a provision of the FCRA that required consumer reporting agencies (like Spokeo) to provide certain notices to users of its information about the users' responsibilities under the FCRA. *Id.* at 1545 (citing 15 U.S.C. § 1681e(d)).

5

In addressing whether Robins had alleged "concrete" injury, the Supreme Court explained that a concrete injury need not be tangible. *Id.* at 1549. It further provided that both the historic role of the courts and the judgment of Congress play a role in deciding whether intangible injury is "concrete." *Id.* Regarding the former, the Court explained that "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* And Congress' judgment is relevant, stated the Court, because "Congress may elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Id.* (internal quotation marks and alteration omitted). Still, the Court noted, deference to congressional judgment cannot be complete, for Congress might define a harm that is insufficient to give rise to an Article III controversy. *Id.* Thus, in remanding the concrete-injury issue to the Ninth Circuit, the Supreme Court concluded, "Robins cannot satisfy the demands of Article III by alleging a bare procedural violation. A violation of one of the FCRA's procedural requirements may result in no harm. For example, even if a consumer reporting agency fails to provide the required notice to a user of the agency's consumer information, that information regardless may be entirely accurate." *Id.* at 1550.

Given the guidance in *Spokeo*, the Court is concerned about whether Plaintiffs (and the class they seek to represent) have suffered a "concrete" injury. (Indeed, this case was at one point stayed pending the Supreme Court's decision in *Spokeo*.) As noted, Plaintiffs here allege that Kelly violated 15 U.S.C. § 1681b(b)(2)(A) by including both a waiver and disclaimer in a form that should have only disclosed that Kelly would procure a consumer report for employment purposes and sought authorization to do so. (R. 1, PID 23, 28.) Plaintiffs' claim, however, is not that Kelly's inclusion of the waiver and disclaimer in the form caused them to not understand the

disclosure. Nor do they claim that, in signing the form, they did not understand that they were authorizing Kelly to obtain their consumer report. Indeed, in their motion for preliminary approval, Plaintiffs acknowledge that there is no "indication, *or any plausible scenario*, in which members of the Settlement Class suffered actual damages based upon the wording of Defendant's forms." (R. 37, PID 481 (emphasis added).)

So the jurisdictional question before the Court reduces to this: under circumstances where Plaintiffs were not (by their own admission) actually damaged, is an alleged violation of the stand-alone disclosure requirement of § 1681b(b)(2)(A) a claim of a "bare procedural violation" that is not "concrete" enough under *Spokeo*? Or does it constitute concrete, intangible harm? The Sixth Circuit has not answered this question and the courts are divided.

In *Thomas v. FTS USA, LLC*, the court rejected the defendants' assertion that the plaintiff's FCRA claim amounted to a claim of bare procedural injury. *See* No. 3:13-CV-825, 2016 WL 3653878, at *8–11 (E.D. Va. June 30, 2016). The plaintiff had alleged (among other things) that the defendants did not comply with both the stand-alone disclosure and the "clear and conspicuous" requirements of § 1681b(b)(2)(A). *Id.* at *1. In answering the "concrete" injury question, the court in *Thomas* analogized to three cases where the Supreme Court had found that deprivation of information amounted to a constitutional injury in fact. *Id.* at *9. In *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74 (1982), the Supreme Court found that, despite having no intent to buy or rent, a "tester" plaintiff had standing to assert a violation of a statute that made it unlawful "[t]o represent to any person because of race . . . that any dwelling is not available . . . when such dwelling is in fact so available"; the Court reasoned that the statute "establishe[d] an enforceable right to truthful information concerning the availability of housing." In *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989), the Supreme

7

Court found that an organization had standing to seek information that would have allowed it to monitor the ABA's "workings and participate more effectively in the judicial selection process." And in *Federal Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998), the Supreme Court concluded that a group of voters suffered constitutional "injury in fact" where they were unable to obtain information about an organization's contributions and donors that would have helped them evaluate candidates for public office. "In the wake of *Havens*, *Akins*, and *Public Citizen*," reasoned the *Thomas* court, "it is well-settled that Congress may create a legally cognizable right to information, the deprivation of which will constitute a concrete injury." *Id.* at *9. Returning to § 1681b(b)(2)(A), the *Thomas* court concluded that by requiring the disclosure to be "clear," "conspicuous," and "in a document consisting solely of the disclosure," Congress had created a legally cognizable right to information. Thus, the failure to comply with § 1681b(b)(2)(A)—the failure to provide the disclosure without the encumbrance of any extraneous information—amounted to concrete, informational injury.

The court in *Thomas* also found that the alleged violation of § 1681b(b)(2)(A) gave rise to a second concrete injury. When a disclosure does not comply with that provision of the FCRA, the *Thomas* court reasoned, the consumer has not been given the proper disclosure, and so any authorization based on that disclosure is invalid. *See id.* at *10. It followed that the defendants' procurement of a consumer report violated the consumer's "statutory right of privacy." *Id.* Apparently addressing the historic-role-of-courts consideration identified in *Spokeo*, the court in *Thomas* noted that the "common law ha[d] long recognized a right to personal privacy, and both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." *Id.* Accordingly, the court concluded that the defendants' violation of § 1681b(b)(2)(A) also amounted to a concrete, invasion-of-privacy

8

injury. *Id.* at *11; *see also Syed v. M-I, LLC*, — F.3d —, No. 114CV00742, 2017 WL 242559 (9th Cir. Jan. 20, 2017) (citing *Thomas* with approval and finding that § 1681b(b)(2)(A) creates rights to information and privacy the violation of which gives rise to concrete injury).

Faced with facts similar to those in *Thomas*, the court in *Shoots v. iQor Holdings US Inc.*, reached a different conclusion regarding the concreteness of the plaintiff's injury. No. 15-CV-563, 2016 WL 6090723 (D. Minn. Oct. 18, 2016). Shoots claimed that iQor had violated § 1681b(b)(2)(A) by including extraneous information in a disclosure form. *Id.* at *1. Although acknowledging the Supreme Court's decisions in *Havens*, *Akins*, and *Public Citizen*, the court found unpersuasive Shoots' claim that he had suffered informational or privacy injury sufficient for Article III standing. *See id.* at *6–7 & n.2. Regarding the claimed privacy injury, the court explained that had Shoots alleged that the extraneous information in the form "confused him in some way," or that the background check "had directly harmed" him, "a case could be made that an invasion of privacy actually occurred." *Id.* at *5. But Shoots had not alleged either of those things. *Id.* And regarding Shoots' claim of informational injury, the court ruled, "If Shoots had contended somehow that iQor's failure to provide him with a stand-alone disclosure had amounted to a constructive deprivation of information—such as by impeding his ability to understand what he was signing, or by hiding important information in a thicket of legalese—this might well be a different case. But without such allegations, Shoots's injury—even if styled an 'informational' one—is nothing more than technical, and insufficient to meet the requirements either of [*Braitberg v. Charter Commc'ns, Inc.*, No. 14–1737, 2016 WL 4698283 (8th Cir. Sept. 8, 2016)] or *Spokeo*." *Id.* at *8.

For several reasons, the Court declines to fully weigh in on this split in authority. First, the "concrete" injury question has not been presented to this Court in an adversarial setting. To

9

be sure, the Court has a duty to police its own subject-matter jurisdiction. But that task is made difficult where, at oral argument, both Plaintiffs and Kelly urged the court to follow *Thomas*. Second, the Court believes it can answer the concrete-injury question based on the unique facts of this case. Here, in addition to disclosing that Kelly would procure a consumer report to assess employability, the disclosure form included a waiver that read, "To the fullest extent permitted by law, I release Kelly, its employees, agents, successor and assigns, from any and all claims, actions or liability whatsoever that are in any way related to the procurement of a consumer report about me, or any subsequent investigation(s) of my background or personal history." (R. 2, PID 32.) Thus, in signing the disclosure form, a job applicant could have thought she was merely agreeing not to sue Kelly if it ran a background check (the waiver)—not that she was granting Kelly permission to run a background check (the disclosure). Or perhaps the consumer could have thought the reverse. As this is not implausible, there is a *risk* of harm alleged in this case. And in *Spokeo*, the Court provided that "the risk of real harm" could satisfy the requirement of concreteness. 136 S. Ct. at 1549. Thus, given the manner in which this issue has been presented, the Court finds that Plaintiffs have suffered a "concrete" injury sufficient for this litigation to present an Article III case or controversy.[2]

### III.

Jurisdiction having been established, the Court turns to the terms of the parties' settlement agreement and whether, on preliminary review, they are fair and reasonable.

"[B]y way of background, class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition are not present during the negotiations." *Shane Grp., Inc. v. Blue Cross Blue Shield of*

---

[2] The Court does not hold that any violation of the stand-alone disclosure requirement, no matter how minimal, would give rise to concrete injury for purposes of Article III.

*Michigan*, 825 F.3d 299, 309 (6th Cir. 2016). As such, "there is always the danger that the parties and counsel will bargain away the interests of unnamed class members in order to maximize their own." *Id.* While this is "not an indictment of any parties or counsel in particular; it is merely a recognition of the adverse incentives at work in class-action settlements." *Id.* Thus, it is this Court's responsibility to "carefully scrutinize whether the named plaintiffs and counsel have met their fiduciary obligations to the class, and whether the settlement itself is 'fair, reasonable, and adequate.'" *Id.* (quoting Fed. R. Civ. P. 23(e)(2)).

At the preliminary approval stage, the Court does not finally decide whether the settlement is fair and reasonable. *See In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 337 (N.D. Ohio 2001) (explaining that preliminary approval "is only the first step in an extensive and searching judicial process, which may or may not result in final approval of a settlement"). The question now before the Court is simply whether the settlement is fair enough that it is worthwhile to expend the effort and costs associated with sending potential class members notice and processing opt-outs and objections. *See* Newberg on Class Actions § 13:10 (5th ed.).

The fairness of a class-action settlement can be assessed by separately examining procedural and substantive aspects of the agreement. The Court starts with procedural fairness.

### A.

"The primary procedural factor courts consider in determining whether to preliminarily approve a proposed [class-action] settlement is whether the agreement arose out of arms-length, noncollusive negotiations. . . . Where the proposed settlement was preceded by a lengthy period of adversarial litigation involving substantial discovery, a court is likely to conclude that settlement negotiations occurred at arms-length." Newberg on Class Actions § 13:14 (5th ed.).

11

The procedural history of this case reflects arms-length, noncollusive negotiations. First, the parties engaged in both informal and formal written discovery. (R. 37, PID 508.) This indicates that they attempted to understand the evidentiary support for their own and the opposition's legal positions. Second, the parties engaged in two mediation sessions. The first was before Retired United States District Judge Layne Phillips in February 2015, the second before Retired United States District Judge Wayne Anderson in January 2016. (R. 37, PID 507–08.) In both mediations, the parties submitted mediation briefs. The mediations and associated briefing indicate that the parties have a deep understanding of the strength and weakness of their cases, and the use of neutral, experienced mediators is an indication that the parties' agreement is noncollusive. *In re Penthouse Exec. Club Comp. Litig.*, No. 10 CIV. 1145 KMW, 2013 WL 1828598, at *2 (S.D.N.Y. Apr. 30, 2013) ("The assistance of two experienced mediators . . . reinforces that the Settlement Agreement is non-collusive. A settlement like this one, reached with the help of third-party neutrals enjoys a presumption that the settlement achieved meets the requirements of due process." (internal quotation marks omitted)). Further, both the named plaintiffs' incentive fees and attorneys' fees were negotiated after the amount of the settlement fund was negotiated. This suggests that fees and incentive awards were not the primary reason for settlement. True, depositions were not taken in this case nor was there any dispositive motion practice. Even so, on balance, the Court preliminarily finds that settlement was reached in a procedurally fair manner.

### B.

"The starting place for understanding the substantive requirements for preliminary approval is in reviewing the substantive requirements for final approval." Newberg on Class Actions § 13:15 (5th ed.). The Sixth Circuit has identified the following non-exhaustive list of

factors for courts to consider in deciding whether to finally approve a class-action settlement: "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 754 (6th Cir. 2013) (internal quotation marks omitted).

In addition, in assessing the substantive fairness of the agreement, courts have asked whether (8) the attorneys' fees are reasonable, (9) the named representatives received preferential treatment, (10) the notice plan is sufficient, (11) the claims procedure is onerous, (12) the allocation of the fund is fair, and (13) the class members' release of claims is overly broad. *See* Newberg on Class Actions § 13:15 (5th ed.).

## 1.

The Court beings with whether the amount of recovery a class member will receive under the settlement is fair when compared to the likely amount of recovery at trial. *See Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 309 (6th Cir. 2016) ("[T]he district court must specifically examine what the unnamed class members would give up in the proposed settlement, and then explain why—given their likelihood of success on the merits—the tradeoff embodied in the settlement is fair to unnamed members of the class."). A logical way to make this assessment is to compare the settlement recovery against the expected value of proceeding to trial: "if the class had a 10% chance of securing a $100,000,000 jury verdict, a $10,000,000 settlement would seem reasonable." Newberg on Class Actions § 13:49 (5th ed.). Thus, the analysis can be broken down into four steps: (1) determining the amount of recovery under the settlement, (2) determining the amount of recovery assuming success at trial, (3) determining the

likelihood of succeeding at trial, and (4) comparing the recovery under the settlement with the recovery a class member will receive at trial discounted by the possibility that the class members will not prevail at trial.

Starting with step one, as noted, if the parties' settlement is approved, and every class member makes a claim, Adjudicated Ineligible class members will receive about $41, while those who received a favorable rating will receive about $14 (the average over all class members is about $19). Although Plaintiffs have cited significantly higher recoveries under the settlement based on a more likely 15% claim rate, the $41 and $14 figures allow for the proper comparison: if this case was tried, and Plaintiffs prevailed, every class member would recover without having to file a claim.

Proceeding to step two, the amount of recovery at trial assuming success, Plaintiffs in this case (quite reasonably) seek statutory as opposed to actual damages. Under the FCRA, a consumer may recover statutory damages of "not less than $100 and not more than $1,000," punitive damages, costs, and attorneys' fees—if he is able to show that the defendant's violation of the FCRA was willful. *See* 15 U.S.C. § 1681n. Thus, if Plaintiffs were to show at trial that Kelly willfully violated the FCRA, each potential class member would be entitled to something in the range of $100 to $1,000.

A review of Plaintiffs' claim indicates that, assuming success, the award at trial would be around $100. While the inclusion of the waiver and disclaimer might have been inconsistent with the language of the stand-alone disclosure requirement, it was arguably consistent with the purpose of that provision. *See* Letter from Cynthia Lamb, Investigator, Div. of Credit Practices, Fed. Trade Comm'n, to Richard Steer, Jones Hirsch Connors & Bull, P.C. (Oct. 21, 1997), 1997 WL 33791227 (F.T.C.), 1 ("The reason for specifying a stand-alone disclosure was so that

consumers will not be distracted by additional information at the time the disclosure is given."). As for the possibility that applicants did not understand the waiver (because it was included on the disclosure form), there is no indication that Kelly has ever attempted to enforce that waiver. (R. 37, PID 481 n.3.) As such, the violation of the FCRA asserted in this case is only technical in nature, and so the Court would expect class members to receive around $100—or less—should they prevail at trial. *See Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 680 (D. Md. 2013) ("[T]his case involves allegations of technical FCRA violations, which creates the risk that even if a jury awarded the minimum requisite statutory damages, i.e., $100 to each of the individual class members, the court may find remitter/reduction appropriate."); *Klingensmith v. Max & Erma's Restaurants, Inc.*, No. CIV.A. 07-0318, 2007 WL 3118505, at *5 (W.D. Pa. Oct. 23, 2007) (asserting, where claim was that display of credit card expiration dates on receipts violated the FCRA, "that were a jury to award even the minimum requisite statutory damages for Defendant's technical violations, i.e., $100 to each of the 225,000 individual class members," that remittitur or reduction "might well" be appropriate).

This last step of the analysis assumed success at trial, but a preliminary review of the merits reveals that this is not a certainty. As noted, to recover statutory damages, Plaintiffs would have to show that Kelly willfully violated the FCRA. A plaintiff demonstrates a willful violation of FCRA by showing that the defendant knowingly violated the Act, or, less onerously, that the defendant recklessly disregarded the Act's requirements. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56–58 (2007). But a defendant's action is not in reckless disregard of the FCRA unless the action "shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading [of the FCRA] that was merely careless." *Id.* at 50.

Here, there is good reason to think Plaintiffs might not be able to show that Kelly, by including the waiver and disclaimer on its disclosure forms, knew it was violating the stand-alone disclosure provision or that it took a risk "substantially greater" than that associated with a careless reading of that provision. It appears that Kelly used disclosure forms that contained a waiver or disclaimer only between December 1, 2011 and January 23, 2014. (*See* R. 6, PID 557.) The time period is important because, while many courts have since found that the inclusion of a waiver in a disclosure runs afoul of the stand-alone disclosure requirement (*see* R. 42, PID 656 n.1), prior to January 2014, only two district courts had made findings to that effect, *see Reardon v. ClosetMaid Corp.*, No. 2:08-CV-01730, 2013 WL 6231606, at *8–9 (W.D. Pa. Dec. 2, 2013); *Singleton v. Domino's Pizza, LLC*, No. CIV.A. DKC 11-1823, 2012 WL 245965, at *9 (D. Md. Jan. 25, 2012). This could be read as indicating that Kelly's inclusion of a wavier on the disclosure form did *not* violate the stand-alone disclosure requirement. *See Smith v. Waverly Partners, LLC*, No. 3:10-CV-00028-RLV, 2012 WL 3645324, at *5–6 (W.D.N.C. Aug. 23, 2012); *Burghy v. Dayton Racquet Club, Inc.*, 695 F. Supp. 2d 689, 699 (S.D. Ohio 2010). Indeed, one court has cited these four cases as indicating a split in authority regarding the propriety of including waivers in disclosure forms. *See Syed v. M-I LLC*, No. CIV. 1:14-742 WBS, 2014 WL 4344746, at *3 (E.D. Cal. Aug. 28, 2014). As Plaintiffs acknowledge in their motion for preliminary approval, given the state of the case law during the period that Kelly used disclosure forms that allegedly violated § 1681b(b)(2)(A)(i), it appears that, if this case were to proceed to trial, Plaintiffs would have some difficulty convincing this Court or a jury that Kelly knowingly violated that provision or that its conduct reflected substantially more than a careless reading of that provision.

Now the last step: comparison. As explained, if Plaintiffs prevailed at trial, each class member would receive around $100, while under the settlement, each class member is only guaranteed to receive, on average, $19. But, as also noted, Plaintiffs' likelihood of success at trial is not 100%. And once the $100 award is discounted by the likelihood of success at trial (which is conceivably in the ballpark of 19%), the amount of recovery under the settlement appears reasonable. And the amount seems even more reasonable in light of the non-monetary benefits class members will receive under the settlement.

Accordingly, the Court preliminarily finds that the amount of recovery under the settlement is fair relative to the likely amount of recovery should Plaintiffs proceed to trial.

## 2.

The Court also considers what the potential class members will give up to obtain that recovery. Thus, in assessing the fairness of the settlement, it is also necessary to evaluate the scope of Kelly's release.

As it originally appeared in the parties' settlement agreement, class members agreed to release Kelly from any and all claims "arising out of or relating directly or indirectly in any manner whatsoever to the facts alleged or which could have been alleged or asserted in the Complaint and Amended Complaint, including but not limited to any and all claims under 15 U.S.C. §§ 1681b(b)(1), 1681b(b)(2) and 1681b(f) of the Fair Credit Reporting Act and any analogous state law claims." (R. 37, PID 531.)

The Court thought that this release was overbroad. A "fact[] alleged" in the amended complaint was that Plaintiffs applied for a position offered by Kelly. A claim relating "indirectly in any manner whatsoever" to this fact could be, for example, a claim of discrimination in hiring.

17

As this was plainly not what this suit was about, the Court expressed to the parties its concern over the breadth of the release.

The parties have stipulated to a narrower release. Class members who do not opt out now will release Kelly from any and all claims "arising out of or relating directly or indirectly in any manner whatsoever to the facts alleged or asserted in the Complaint and Amended Complaint *and which relate directly or indirectly in any manner whatsoever to Defendant's procurement of consumer reports*, including but not limited to any and all claims under 15 U.S.C. §§ 1681b(b)(1), 1681b(b)(2) and 1681b(f) of the Fair Credit Reporting Act and any analogous state law claims." (R. 49, PID 776–77 (emphasis added).) The parties further agree, "This release is . . . not intended to be construed as a general release of all employment related claims." (R. 49, PID 777–78.)

Given the revised language, the Court finds that the scope of release does not disfavor preliminary approval of the settlement. It now represents a more typical release that is tied more directly to the claim at issue—Kelly's procurement of consumer reports in a manner that violates the FCRA. Under the standard that now governs preliminary approval, the release does not require further revision.

### 3.

Turning to Plaintiffs' anticipated attorneys' fee request of 33% of the settlement fund, or approximately $2.25 million, the Court finds that this request is in the ballpark of a reasonable award. *See Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 426 (6th Cir. 2012) ("The 'majority of common fund fee awards fall between 20% and 30% of the fund.'"); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Studies 811, 839 (2010) (providing that for settlements in the range of $4.45 to

$7 million, the average attorneys' fees award over all class-action settlements in 2006 and 2007 was 27.4%).

For two reasons, the prior paragraph was purposely conclusory. First, the settlement agreement is not contingent upon an award of attorneys' fees: "Should the Court decline to approve any requested [attorneys' fees and costs] payment, or reduce such payment, the Settlement shall still be effective." (R. 37, PID 521–22.) Second, Plaintiffs' attorneys' fee request is not briefed. Under the proposed agreement, Plaintiffs will brief their request 14 days prior to the opt-out deadline. (R. 37, PID 534.) At that point, the Court will be in a better position to evaluate the reasonableness of the fee request.

True, one fact counsels toward a more complete analysis at this stage of the litigation: the notices sent to class members will include an estimate of their recovery (a $90 estimate appears on the notices sent to the favorable group, a $270 one on those sent to the Adjudicated Ineligible group based on the more realistic claim rate). That estimated recovery is affected by the fee award because attorneys' fees are drawn from the settlement fund. And the estimated recovery is, of course, a factor in a class member's decision to opt-out, object, or make a claim.

Even so, the Court maintains that a full attorneys' fees analysis is not necessary at this time. This is because even if the Court were to award counsel something less than the requested 33% of the fund, the Court's reduction in fees is unlikely to be so significant that each individual class member would be entitled to significantly more. Indeed, the amount a class member ultimately recovers likely depends more on how many others make claims.

All of that said, the Court's research has identified several fee-related issues that Plaintiffs should address in their fee motion.

*One.* Under the proposed settlement, the amount of attorneys' fees is based on a percentage of the settlement fund. But some courts have held that where, as here, a statute awards fees to the prevailing party, the amount of fees should be determined based on the loadstar method. *See Yeagley v. Wells Fargo & Co.*, 365 F. App'x 886, 887 (9th Cir. 2010) ("Under a fee-shifting statute such as the FCRA, see 15 U.S.C. § 1681n(a)(3), the loadstar method is generally the correct method for calculating attorneys' fees."); *Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 259–60 (E.D. Pa. 2011) ("[B]ecause the damages provision of the FCRA includes such a mechanism for attorneys fees, courts evaluating attorneys' fees following settlements of FCRA actions have often employed the loadstar method."). Plaintiffs should address this case law in their motion for fees.

*Two.* Even if a percentage-of-the-fund award is proper, courts are encouraged to cross-check that amount with the loadstar in determining reasonableness. *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) ("[T]he loadstar remains useful as a baseline even if the percentage method is eventually chosen. Indeed, we encourage the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage."); *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 779–81 (6th Cir. 1996) (affirming the district court's fee award where "district court based its fee award on a percentage of the common fund and then cross-checked the fee against class counsel's loadstar"); *cf. Gascho v. Glob. Fitness Holdings*, LLC, 822 F.3d 269, 281 (6th Cir. 2016) (performing cross-check of loadstar with percentage-of-fund analysis). Thus, Plaintiffs should, in all events, provide a loadstar analysis in their motion for fees.

*Three.* Under the proposed settlement, the amount of attorneys' fees is 33% of the total settlement fund. This percentage may be slightly high. *See Gooch*, 672 F.3d at 426; *In re*

20

*Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure."); *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 688 (D. Md. 2013) (setting forth detailed attorneys' fees analysis in FCRA case involving a stand-alone disclosure claim and awarding 25% of fund instead of requested 30%); Manual Complex Lit. § 14.121 (4th ed.) ("Attorney fees awarded under the percentage method are often between 25% and 30% of the fund."); Fitzpatrick, *supra*, at 839. Plaintiffs should address the case law suggesting that 33% of the settlement fund may be slightly high.

## 4.

In assessing whether a class-action settlement is substantively fair, courts "also look[] to whether the settlement gives preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 755 (6th Cir. 2013) (internal quotation marks omitted).

Here, the named Plaintiffs will receive the same guaranteed damage payout as the other class members. They differ, however, in the settlement's award of an additional $2500 incentive fee to the named Plaintiffs. Thus, Plaintiffs will receive on the order of 100 times more than what their fellow class members are guaranteed to recover. *Cf. Vassalle*, 708 F.3d at 756 ("The $17.38 payment [to class members] can only be described as *de minimis*, especially in comparison to the now-forgiven debt of $4,516.57 owed by [one of the named plaintiffs]."). And even accepting Plaintiffs' estimated 15% claim rate, $2,500 is over 25 times more than the $90 other class members will receive. Moreover, although Plaintiffs' counsel avers that Plaintiffs "have been consistently engaged in this case" (R. 37, PID 508), the Court notes that there have been limited

in-court proceedings, no depositions, and, presumably, most if not all of the work of the mediation and settlement was done by Plaintiffs' counsel as opposed to Plaintiffs.

Thus, while the $2,500 incentive award to each Plaintiff does not on its face indicate that Plaintiffs failed to settle in the best interests of the entire class, the Court directs the parties to either reconsider this award or further justify it when they seek final approval. *See Shane Grp.*, 825 F.3d at 311.

**5.**

The Court next examines whether the proposed notice of the settlement and notice of class certification is adequate. This has two aspects: the manner in which the parties intend to notify potential class members and what the parties will tell the potential members in the notices.

Regarding the manner of notice, Plaintiffs must comply with two sets of requirements. Because they seek to certify a Rule 23(b)(3)-type class, Rule 23(c)(2)(B) applies:  "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." In addition, because the parties seek to settle this litigation, the manner in which they provide notice must further comply with Rule 23(e)(1): "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." *See In re Prudential Ins. Co. of America Sales Practices Litigation*, 962 F. Supp. 450, 526 (D.N.J. 1997) ("The combined Class Notice must meet the requirements of both Rule 23(c)(2) and Rule 23(e).").

Plaintiffs propose notifying class members of this potential class action and the settlement by mailing postcards to the putative class members. In particular, the settlement administrator will use the address information that Kelly has on file for the putative class members and then, prior to mailing, update those addresses based on the U.S. Postal Office's

National Change of Address System. (R. 37, PID 515, 524.) In addition, if postcards are returned as undeliverable, the settlement administrator will re-mail the postcard to the forwarding address provided or, if no forwarding address is provided, the administrator will use "any other legally available database for the purpose of finding new addresses and remailing." (R. 37, PID 523.)

The foregoing efforts appear to satisfy Rule 23(c)(2)(B). *See In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1098 (5th Cir. 1977) ("[Rule 23](c)(2)'s reasonable effort standard requires that, once a 23(b)(3) action has been certified, the name and last known address of each class member known to the parties or capable of being identified from business or public records available to them must be produced.").

As for the contents of a class notice, Plaintiffs must again comply with two sets of requirements. Rule 23(c)(2)(B) requires that the notice "clearly and concisely state in plain, easily understood language" the following: "the nature of the action," "the definition of the class certified," "the class claims, issues, or defenses," "that a class member may enter an appearance through an attorney if the member so desires," "that the court will exclude from the class any member who requests exclusion," "the time and manner for requesting exclusion," and "the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B).

In addition, because the parties wish to settle this class action, to comply with Rule 23(e)(1), the notice should also include "the essential terms of the proposed settlement," "any special benefits provided to the class representatives," "information regarding attorney's fees," "the time and place of the hearing to consider approval of the settlement," "the method for objecting to (or, if permitted, for opting out of) the settlement," "the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, clearly set forth those variations," "the basis for valuation

23

of nonmonetary benefits"; should "provide information that will enable class members to calculate or at least estimate their individual recoveries, including estimates of the size of the class and any subclasses"; and should "prominently display the address and phone number of class counsel and how to make inquiries." Manual for Complex Litigation § 21.312 (4th ed.).

The Court carefully reviewed the two postcard notices originally proposed by the parties (one for the Adjudicated Ineligible members, the other to the favorably rated). (*See* R. 37, PID 545–46, 551–52.) The postcards provided a summary of the settlement and set forth most of the information that Rule 23(c)(2)(B) and Rule 23(e) require. But there were two significant omissions: (1) a description of the release of claims and (2) a description of how the class is divided into two groups. As for the former, it is presumably important to a potential class member to know what he gives up if he makes a claim. As to the latter, it may be significant to a potential class member's decision to object that another class member is receiving up to three times more.

Both before and after the preliminary approval hearing, the Court met with counsel and discussed these omissions. Counsel has submitted (twice) revised postcards that include this information. (*See* R. 53, PID 813, 815, 820.)

It is true that some of the other information about the settlement that should be provided to class members under Rule 23(e)(1) is not included on the revised postcards. This is to be expected given the limited space available on the postcard. And the information omitted—the full class definition, benefits provided to the class representatives, the procedures for distributing settlement funds, the valuation of nonmonetary benefits, and the size of the class—is not essential for a class member to have a good sense of whether to make a claim, object, or opt-out. As a class member, the primary assessment is this: "is the amount I will receive (along with the

24

right to obtain my consumer report) a fair trade for giving up my right to sue Kelly for claims relating to a disclosure document that also included a liability waiver"? Now that a description of the release has been added, the information necessary to answer that question is on the postcards. Moreover, any other relevant information omitted from the postcard is included on the long-form notice. And the postcard makes plain that the long-form notice is available by either visiting the settlement website or by calling the settlement administrator.

In all, the Court finds that the content of the revised postcards that will be mailed to class members, especially when supplemented by the long-form notice explicitly referenced in the postcards, meets the requirements of Rule 23(c)(2)(B) and Rule 23(e)(1). *See In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 151–52 (D.N.J. 2013) (finding notice complied with Rules 23(c)(2)(B) and 23(e)(1) where postcard included the essential information about the settlement and class and postcard was supplemented by a detailed notice that was mailed to those who requested it and published on the settlement website).

**6.**

The Court next examines whether the proposed processes for making claims under, objecting to, or opting-out of the settlement agreement are fair and reasonable.

Regarding the claims process, one inconsistency initially gave the Court pause. Under the settlement, class members that fail to take action are included in the settlement and thus grant Kelly a release of claims. Yet, the settlement requires a class member to take action to receive a benefit. In other words, Kelly receives its benefit of the bargain when a class member does nothing, but the class member does not.

Even considering that potential facial inequity, the Court preliminarily finds that the claims process is reasonable. The alleged wrong in this case occurred in the range of two to four

years ago and so a claims requirement, as opposed to sending checks to all that do not opt-out, helps reduce the chance of funds being erroneously sent to people who are not members of the class. As the Sixth Circuit recently explained:

> The objectors assert that a check simply should have been mailed to the address listed for each class plaintiff because common sense dictates that direct payment would have resulted in a payout greater than 8% of the claims made. This ignores the inadequate member data, the number of the checks that would not have reached the class members and the administrative costs of managing that procedure.

*Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 290 (6th Cir. 2016). Moreover, it appears that a claims process is common in class-action settlements. *See id.* Finally, the proposed claims process is far from onerous. The claim form is included with the postcard notice and can simply be signed and dated (with a phone number and email) and dropped back in the mail—the postage is paid. (*See* R. 53, PID 813, 818.) And, as the Court has requested, the parties have made more explicit on the postcard that a claim may also be submitted online. In all then, the Court preliminarily finds that the claims process is fair.

The opt-out procedure also appears fair. Although the postcards do not include an opt-out form, they clearly inform class members that they must submit a written notice to opt out and they direct class members to the settlement website for further instructions. (R. 53, PID 815, 820.) This seems reasonable. *See Krzesniak v. Cendant Corp.*, No. C 05-05156 MEJ, 2007 WL 4468678, at *3 (N.D. Cal. Dec. 17, 2007) (explaining that the Federal Judicial Center's example notice forms "do not appear to contemplate the inclusion" of an opt-out form). Further, the Court proposed an amendment to the long-form notice, which counsel has included, to provide an example of an acceptable written opt-out. (R. 49, PID 761.) If those who wish to be excluded follow the example, they need only provide a signed statement that they wish to opt-out along with their address. (*See id.*) This seems reasonable. *See Wright v. Nationstar Mortage LLC*, No.

26

14 C 10457, 2016 WL 4505169, at *13 (N.D. Ill. Aug. 29, 2016) (overruling objectors claim that opt-out process was burdensome; explaining that "the opt-out requirements were minimal: the request had to be signed, and include the individual's name, address, telephone number, case caption, and a statement that the individual is a class member who wishes to opt-out").

As for the objection procedure, it too appears fair. The postcards clearly inform potential class members that, to object, they must submit a written notice. The cards also inform the potential class members that they may appear in court at the final approval hearing. The postcards further direct those who wish to object to the settlement website, which includes the long-form notice. The long-form notice in turn describes the objection process and sets out the required content of a proper objection. The information that an objector must provide is not onerous, consisting primarily of the objector's contact information, the basis for the objection, and a statement as to whether the objector plans to appear at the final approval hearing. (R. 49, PID 763.)

Accordingly, the Court preliminarily finds that the proposed claims, opt-out, and objection procedures are fair and reasonable.

**7.**

Remaining among the most significant substantive fairness factors at issue is the allocation of the settlement fund.

Given the nature of Plaintiffs' claims, the Court initially had reservations about some class members receiving three times more than others. As discussed, Plaintiffs have not claimed adverse effects from Kelly's alleged violation of the stand-alone disclosure requirement. Moreover, the FCRA includes a separate provision that required Kelly to provide a copy of the

consumer report to applicants prior to taking adverse action based on the report. *See* 15 U.S.C § 1681b(b)(3)(A). Plaintiffs have not alleged a violation of this provision.

But at the preliminary approval hearing, Plaintiffs' counsel explained the reason for one group of class members receiving more than the other. Counsel argued that while all class members suffered an invasion of privacy (because the disclosure was improper and so any authorization based on the disclosure was invalid), those for whom Kelly did not assign a favorable rating presumptively had a greater invasion of privacy. The Court finds this explanation for the disparate recovery acceptable. It is plausible that those with something unfavorable on their report, say, a conviction, would feel that their privacy was violated in a manner greater than those with nothing unfavorable on their report.

Accordingly, the Court preliminarily finds the allocation of the settlement fund to be fair.

\* \* \*

In sum, the Court preliminarily finds that the settlement agreement was reached in a procedurally fair manner. And upon careful review of the agreement, the proposed notices, and the claim, opt-out, and objection procedures, the Court preliminarily finds that the settlement is substantively fair.

## IV.

Remaining is to decide whether Plaintiffs' proposed class should be preliminarily certified.

### A.

Before turning to the Rule 23 requirements for class certification, the Court pauses to briefly address the class definition. *See Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) ("[D]istrict courts have broad discretion to modify class definitions, so

the district court's multiple amendments merely showed that the court took seriously its obligation to make appropriate adjustments to the class definition as the litigation progressed"); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 69 Fed. R. Serv. 3d 791 (M.D. Pa. 2007) ("[T]he Court notes it is not bound by Plaintiffs' proposed class definition and has broad discretion to redefine the class, whether upon motion or *sua sponte*.").

Plaintiffs ask the Court to preliminarily certify the following class for purposes of settlement:

> All persons on whom Defendant procured a consumer report pursuant to the Fair Credit Reporting Act during the period from July 18, 2012 through January 23, 2014, and whose initial hire date at Kelly was during the period of time when Defendant was providing new Kelly applicants with a disclosure form that contained a liability release.

(R. 37, PID 519.)

Prior to the preliminary-approval hearing, the Court questioned two aspects of this class definition. Based on an affidavit submitted by a Kelly representative, Kelly used disclosure forms that included waivers prior to July 2012. (*See* R. 37, PID 556.) So the class definition appeared under-inclusive. In addition, the Court believed that the second limitation on the scope of the class—those "whose initial hire date at Kelly was during the period of time when Defendant was providing new Kelly applicants with a disclosure form that contained a liability release"—might be more sharply defined using start and end dates.

At the hearing, counsel adequately addressed these questions. Regarding the first, counsel informed the Court that the July 18, 2012 date was selected based on the statute of limitations governing Plaintiffs' claim. (This suit was filed on July 18, 2014. (*See* R. 1, PID 9.)) And counsel explained that while dates certain might be used, the language "during the period of time when Defendant was providing new Kelly applicants with a disclosure form that contained a

29

liability release" would not present a who-is-in-who-is-out issue as Kelly had reliably identified all such individuals.

Given counsel's representations, the Court preliminary finds that the class definition is not underinclusive.

## B.

Having determined that the class definition is sound, the Court proceeds to Rule 23's certification requirements. Plaintiffs have the burden of showing that class certification is proper. *Wal-Mart Stores, Inc. v. Dukes*, — U.S. —, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011). To do so, they must convince the Court that their proposed class meets each of the requirements of Federal Rule of Civil Procedure 23(a) and fits one of the types set out in Rule 23(b).

Rule 23(a) requires Plaintiffs' to satisfy four requirements: numerosity, commonality, typicality, and adequacy. The Court discusses each in turn.

## 1.

Plaintiffs' proposed class includes over 220,000 individuals located across the country. Accordingly, "joinder of all members is impracticable" and the numerosity requirement is readily satisfied. *See* Fed. R. Civ. P. 23(a)(1).

## 2.

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." This requirement is not satisfied by the mere showing that there is some question that pertains to all class members; after all, "any competently crafted class complaint literally raises common questions." *Wal-Mart*, 564 U.S. at 349. Thus, Rule 23(a)(2) requires that the determination of a common contention's "truth or falsity will resolve an issue that is central to the validity of each one of the [class members'] claims in one stroke." *Id.* at 350; *see also Sprague v. Gen. Motors*

*Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) ("What we are looking for is a common issue the resolution of which will advance the litigation.").

Here, there are at least two common contentions that, if resolved, would apply to every class members' claim and substantially advance the litigation: (1) whether Kelly's inclusion of the waiver and disclaimer language on its disclosure forms violated the stand-alone disclosure requirement and, if so, (2) whether the violation was willful. As the answers to these questions would likely be dispositive of every class members' claim based on § 1681b(b)(2)(A)(i), the Court preliminarily finds the commonality requirement satisfied.

### 3.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." A representative's claims are "typical" within the meaning of Rule 23(a)(3) if the defendant's conduct that gave rise to the representative's claims also gave rise to the class members' claims, and if the representative and class members seek to establish the defendant's liability "based on the same legal theory." *Romberio v. Unumprovident Corp.*, 385 F. App'x 423, 438 (6th Cir. 2009). Thus, "[a] necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 542 (6th Cir. 2012).

In this case, the reasons that the commonality requirement is satisfied also show that the typicality requirement is satisfied. *See Young*, 693 F.3d at 542 (noting that "[c]ommonality and typicality 'tend to merge'"). Factually, Plaintiffs say that when they applied for a job Kelly offered, they received a disclosure form. Their legal claim is that this form violated § 1681b(b)(2)(A)(i) because it included a waiver and disclaimer. The class members that

Plaintiffs seek to represent also purportedly applied for a job with Kelly and received a materially identical form. Thus, it appears that any class member could be substituted for one of the named plaintiffs and there would be no material shift in the claims of this case.

That said, there is one issue that requires additional exploration. As noted, about 40,000 of the 220,000 potential class members had a consumer report that Kelly did not identify as favorable. And it could be inferred that the parties view these potential class members differently than those in the favorable group, as their settlement grants them three times the recovery. Notably, named Plaintiffs Hillson, Bohler, and Schmidt are not part of this not-favorable group.

Nonetheless, the Court finds that Plaintiffs' claim is typical of that of the Adjudicated Ineligible group. At the preliminary approval hearing, counsel explained that the claim of class members for whom Kelly assigned a favorable rating and the claim of class members that Kelly adjudicated ineligible are identical: they both received and signed a disclosure that allegedly does not comply with the FCRA's stand-alone disclosure provision. The difference between the groups, counsel argued, was the extent of the privacy breach: those in the Adjudicated Ineligible group had potentially embarrassing information revealed without valid authorization. On preliminary review, this explanation is adequate. Although those in the Adjudicated Ineligible group may have been exposed to a risk of greater harm, the type of harm (breach of privacy), the type of wrong (violation of § 1681b(b)(2)(A)(i)), and the facts giving rise to the wrong (a disclosure form with a waiver) are the same for Hillson, Bohler, and Schmidt and all other class members. Thus, by pursuing their claim, Plaintiffs are also pursuing the claim of those in the Adjudicated Ineligible group—even if those class members were exposed to a risk of greater harm.

32

**4.**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997) (citations and internal quotation marks omitted).

For reasons set forth above regarding commonality and typicality, the Court preliminarily finds that Hillson, Bohler, and Schmidt will adequately represent the class. Although there is a possible conflict of interest among Plaintiffs, all of whom received a "favorable" rating, and those in the Adjudicated Ineligible group, counsel satisfied the Court at the preliminary approval hearing that the possibility was nothing more than just that. In particular, Hillson, Bohler, and Schmidt have sought three times the award for those Adjudicated Ineligible, quelling any concerns over self-interest.

Rule 23(a)(4) also demands that "the representatives will vigorously prosecute the interests of the class through qualified counsel." *Young*, 693 F.3d at 543 (internal quotation marks omitted).

The Court preliminarily finds proposed class counsel is qualified to represent the class. Plaintiffs propose that the class be represented by counsel from three firms: Nichols Kaster, PLLP; Berger & Montague, P.C.; and Lyngklip & Associates Consumer Law Center PLC. (*See* R. 37, PID 515.) According to Plaintiffs' motion, the Berger firm is well versed in class-action litigation and lead counsel from Berger, E. Michelle Drake, is "currently serving as lead counsel in over 30 active FCRA class action cases nationwide." (R. 37, PID 497–98.) The Court has no

reason to question these assertions and finds them consistent with the documentation attached to Drake's declaration, including the positive comments by other federal district judges. (R. 37, PID 595–99.) Proposed lead counsel from Nichols Kaster, Anna P. Prakash, avers that Nichols Kaster "has been lead or co-counsel on hundreds of class and collective actions" and that she "has worked almost exclusively on class and collective actions under various consumer-protection and employment laws" over the past several years. (R. 37, PID 603–04.) The Court not only has no reason to question these assertions, Prakash's well prepared and well delivered arguments during the preliminary approval hearing supports them. Finally, the Court's experience with and review of a declaration submitted by Ian B. Lyngklip indicates that he is experienced in both consumer and class-action litigation. (*See* R. 37, PID 637–46.) Again, nothing before the Court is to the contrary. As such, the Court preliminarily approves proposed class counsel to represent the settlement class.

## C.

In addition to satisfying the Rule 23(a) requirements, Plaintiffs must show that their proposed class is one of the varieties listed in Rule 23(b). Plaintiffs claim their class is of the Rule 23(b)(3) type.

To certify a Rule 23(b)(3) class, it must be the case "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "[T]he predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Although predominance overlaps with commonality, "the predominance criterion is far more demanding" than its Rule 23(a) counterpart. *Id.* at 624.

34

Factors that bear on the predominance and superiority inquiries in the settlement context include the class members' interest in maintaining a separate action, other currently-pending litigation concerning the controversy, and the desirability of concentrating the litigation in a particular forum. *See* Fed. R. Civ. P. 23(b)(3)(A)–(C); *see also Amchem*, 521 U.S. at 620 (providing that for settlement-only class certification, a court need not concern itself with Rule 23(b)(3)(D)'s intractable-management-problems factor).

Plaintiffs have made a preliminary showing that the predominance requirement of Rule 23(b)(3) is met. As explained, the primary two issues to be litigated in this case—whether Kelly violated the stand-alone disclosure provision of the FCRA and whether Kelly did so willfully— are issues common to every class member's claim. It is true that the issue of damages might vary from class member to class member. But the Court does not think this likely given that, even with the waiver and disclaimer included on the form, most applicants would likely have understood that Kelly was seeking the applicant's authorization to obtain a consumer report for employment purposes. As such, the Court preliminary finds that Plaintiffs have satisfied the predominance requirement. *See Amchem*, 521 U.S. at 625 (noting that the "[p]redominance is a test readily met in certain cases" involving consumer laws).

The Court also finds that Plaintiffs have made a preliminary showing that the superiority requirement is met. The available damages for Kelly's violation of the stand-alone-disclosure requirement is not large. *Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."). As such, it is unlikely that the claim asserted in this suit would be brought individually. Moreover, even if class members were motivated to bring their claims individually, a class action avoids hundreds of

thousands of suits across the country against Kelly for the same conduct based on the same legal theory. Accordingly, the Court preliminarily finds the superiority requirement satisfied.

**V.**

For the foregoing reasons, the Court preliminarily approves the parties' settlement and preliminarily certifies Plaintiffs' proposed class for settlement purposes as follows:

1.     Preliminary Approval Of Proposed Settlement.  The Settlement Agreement (R. 37, PID 511–43; *see also* R. 49, PID 776–78 (Stipulation and Revised Release)), including both the exhibits thereto (R. 37, PID 548–49 (Ex. B), 554–59 (Ex. D)) and exhibits thereto as revised (R. 49, PID 756–64 (Revised Long-Form Notice); R. 53, PID 813–21 (2d Revised Postcard Notices)), is preliminarily approved as fair and reasonable.

2.     Class Certification For Settlement Purposes Only.  Pursuant to Federal Rule of Civil Procedure 23(c), the Court preliminarily certifies, for settlement purposes only, the following Settlement Class:

> All persons on whom Defendant procured a consumer report pursuant to the Fair Credit Reporting Act during the period from July 18, 2012 through January 23, 2014, and whose initial hire date with Defendant was during the period of time when Defendant was providing new applicants with a disclosure form that contained a liability release.

3.     Class Counsel.  Nichols Kaster, PLLP; Berger & Montague, P.C.; and Lyngklip & Associates Consumer Law Center PLC are hereby APPOINTED as Class Counsel.

4.     Class Representatives.  Plaintiffs LaSandra Hillson, Steven Bohler, and Ashley Schmidt are hereby APPOINTED Class Representatives.

5.     Class Notice.  The Parties' Second Revised Postcard Notice and Claim Form (R. 53, PID 813–16) and Second Revised Adjudicated Ineligible Postcard Notice and Claim Form

(R. 53, PID 818–21) are APPROVED for distribution in accordance with the schedule included in the Settlement Agreement;

6.      Opt-Outs and Objections.  Settlement Class Members shall have the right to either opt out or object to this Settlement pursuant to the procedures and schedule included in the Settlement Agreement.

7.      Final Approval Hearing.  A Final Approval Hearing is set for August 2, 2017 at 10:00 a.m. in Courtroom 242.

s/Laurie J. Michelson
LAURIE J. MICHELSON
U.S. DISTRICT JUDGE

Dated: January 23, 2017

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 23, 2017.

s/Keisha Jackson
Case Manager