IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LASANDRA HILLSON,
STEVEN BOHLER, and
ASHLEY SCHMIDT,
*individually and as representatives of the class,*

| | |
|---|---|
| Plaintiffs, | Case No. 2:15-cv-10803-LJM-APP |
| | Honorable Laurie J. Michelson |
| v. | Magistrate Judge Anthony P. Patti |
| KELLY SERVICES, INC., | |
| Defendant. | |

## PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS, AND CLASS REPRESENTATIVE SERVICE PAYMENTS

Pursuant to Fed. R. Civ. P. 23(h) and 54(d)(2) and the Court's Order dated January 23, 2017 (ECF No. 55), Class Counsel and Named Plaintiffs LaSandra Hillson, Steven Bohler, and Ashley Schmidt ("Plaintiffs" or "Class Representatives") respectfully move the Court for an Order approving the following payments in connection with the Settlement: (1) attorneys' fees to Class Counsel in the amount of $1,687,250, which amounts to 25% of the settlement fund; (2) $37,487.22 to reimburse Class Counsel for their out-of-pocket, documented expenses; (3) settlement administration costs not to exceed $243,216, plus the actual costs of postage; and (4) Class Representative service payments of $2,500 to each of the Plaintiffs. Defendant Kelly Services, Inc. ("Kelly" or "Defendant") takes no position on this motion at this time.

## MEMORANDUM IN SUPPORT

### STATEMENT OF ISSUES PRESENTED

Whether the requested attorneys' fees, litigation expenses, settlement administration costs, and Class Representative service payments are reasonable and should be awarded.

## AUTHORITY FOR RELIEF SOUGHT

Federal Rule of Civil Procedure 23(h) and 54(d)(2).

# INTRODUCTION

Plaintiffs and Class Counsel[1] have litigated this action for more than two-and-a-half years, engaged in multiple mediation sessions and extensive negotiations with Defendant, and ultimately achieved a favorable settlement on behalf of the Settlement Class ("Class"). The Settlement provides for direct monetary benefits and important nonmonetary relief—despite significant hurdles to recovery had this litigation proceeded. These benefits to the Class could not have been achieved absent Class Counsel's time, effort, and skill, as well as Plaintiffs' active participation in the case. Accordingly, Class Representatives and Class Counsel seek Court approval of the following payments in connection with the Settlement: (1) attorneys' fees to Class Counsel in the amount of $1,687,250, which is 25% of the Maximum Settlement Amount ("Settlement Fund"); (2) $37,487.22 to reimburse Class Counsel for their out-of-pocket, documented expenses; (3) settlement administration costs to Epiq Systems not to exceed $243,216, plus the actual costs of postage; and (4) service payments of $2,500 to each of the Class Representatives.

The requested amount of attorneys' fees is reasonable. It constitutes 25% of the Settlement Fund, an amount which is less than the maximum percentage Class Counsel can seek pursuant to the Settlement Agreement. The requested litigation

---

[1] Unless otherwise explicitly defined herein, all capitalized terms have the same meanings as those set forth in the Parties' Settlement Agreement (*ECF No. 37-2*).

costs, administration expenses, and service awards are also reasonable. Plaintiffs and Class Counsel thus respectfully request that this Court grant their motion.

## BACKGROUND

### I.   SUMMARY OF CLAIM AND SETTLEMENT

This case involves the FCRA's "stand-alone disclosure" provision, which requires that, prior to procuring a background check, employers make a clear and conspicuous written disclosure, in a document that consists solely of the disclosure, that a consumer report may be obtained. 15 U.S.C. § 1681b(b)(2). Plaintiffs filed a complaint in the Northern District of California on July 18, 2014, alleging that Defendant willfully violated this provision by including a liability release and other extraneous information in its disclosure. *See Complaint, ECF No. 1 (N.D. Cal.).*

Initially, the Parties agreed to attend an early mediation with Hon. Layn Phillips of Phillips ADR, which occurred on February 23, 2015. *Declaration of E. Michelle Drake* ("*Drake Decl.*") ¶ 3. Prior to attending the mediation, the Parties exchanged informal discovery and detailed mediation briefs. *Id.* The initial mediation was ultimately unsuccessful, and the Parties returned to litigation.

Following the February 2015 mediation, the Parties stipulated to transfer the case to this Court. *ECF No. 50 (N.D. Cal.).* Then, on April 27, 2015, the Supreme Court granted a writ of certiorari in *Spokeo, Inc. v Robins*, No. 13-1339, 2015 WL 1879778, at *1 (U.S. Apr. 27, 2015), to review whether a "plaintiff who suffers no

concrete harm" can satisfy the injury-in-fact requirement of Article III standing. Order Granting Cert., *Spokeo, Inc. v. Robins*, No. 13-1339 (S. Ct. April 27, 2015).

On May 22, 2015, Defendant moved to stay litigation pending the Supreme Court's decision in *Spokeo*, and Plaintiffs opposed the motion. *ECF Nos. 18, 21.* The motion to stay was briefed in detail and argued before the Court. The Court granted the motion to stay on July 15, 2015, noting that *Spokeo* had a "high potential to be completely dispositive of the instant case." *ECF No. 29.* Despite the stay, the parties agreed to attend a second mediation. *Drake Decl. ¶ 5.* The second mediation took place on January 7, 2016, and resulted in a settlement. *Id. ¶¶ 5-7.* *Spokeo* was decided on May 16, 2016. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), *as revised* (May 24, 2016). After months of further, extensive negotiations surrounding the terms of the final settlement agreement, on June 8, 2016, the parties executed a final Settlement Agreement. *Drake Decl. ¶ 7.* The Court preliminarily approved the Settlement on January 23, 2017. *ECF No. 55.*

The full Settlement Agreement and a detailed summary of the same were filed with Plaintiffs' motion for preliminary approval and are explicitly incorporated here by reference. *See ECF No. 37*; *ECF No. 37-2* (hereinafter, "*Settlement Agreement*"). In summary, the Agreement establishes a Settlement Fund of $6,749,000. *Settlement Agreement ¶ 45.* After any deductions for attorneys' fees, expenses, and service payments, the Settlement Fund will be

divided pro rata among Class Members who timely return claim forms, with Class Members who were Adjudicated Ineligible—those who had a background check result other than "favorable"—receiving three times the amount that Class Members who were not so adjudicated will receive. *Id.* ¶¶ 46-49.[2]

The Settlement also provides three forms of nonmonetary relief. First, Defendant has agreed not to include a liability release on its FCRA disclosure form for a period of five years, unless there is a material change in the law. *Id.* ¶ 42. Second, the Settlement allows Class Members to receive a free copy of any consumer report Kelly procured on them. *Id.* ¶ 54(e). The Settlement Website includes a simple-to-use form that Class Members can utilize to request reports. *See* http://hillsonfcrasettlement.com/request.php (last visited March 27, 2017). Class Members can also request copies of their reports through a toll-free call center. *Id.* ¶ 55. Third, under the Settlement, Defendant will designate a dedicated "Consumer Reports Information Operator," who, for a period of three years, will provide Class Members and Kelly's temporary employees with information about procuring copies of their background checks. *Id.* ¶ 43.

The Settlement allows Class Counsel to seek up to one-third of the Settlement Fund as well as Class Representative Service Payments of $2,500 for each of the Plaintiffs. *Id.* ¶ 47-48. The amounts of service payments and attorneys'

---

[2] The parties will update the Court with final numbers regarding what each Class Member would receive in their forthcoming motion for final settlement approval.

fees were negotiated only after the Parties had agreed on the amount of the Settlement Fund and the method of distribution to Class Members. *Id.* The Settlement is not contingent on the Court awarding attorneys' fees or service payments in this amount (or in any amount). *Id.*

## II.   CLASS COUNSEL'S EXPERIENCE AND EFFORTS TO SECURE BENEFITS FOR THE CLASS

The specific qualifications of Class Counsel are set forth in the accompanying Declarations of E. Michelle Drake, Paul J. Lukas ("Lukas Decl."), and Ian Lyngklip ("Lyngklip Decl.") and are incorporated herein. As a result of their experience in this area, Class Counsel were able to efficiently and effectively litigate this action and had the credibility necessary to negotiate a fair and reasonable settlement on behalf of the Class.

Class Counsel has worked without compensation or reimbursement for their time and out-of-pocket expenses necessary to position this case for settlement. *Drake Decl.* ¶¶ 10-11. Before taking on this case, Plaintiffs and Class Counsel negotiated a customary one-third contingency fee, with the understanding that this amount was an appropriate incentive for Class Counsel to take on the financial risks involved in the representation. *Id.* ¶ 8. Class Counsel also agreed to advance all costs of this litigation. *Id.* ¶¶ 8, 10. Plaintiffs and Class Counsel agreed that Class Counsel would receive reimbursement for its costs from the value of a successful settlement or judgment. *Id.* ¶ 8. In the event that Class Counsel did not

7

successfully resolve this matter, Class Counsel would have been paid nothing and would have been required to absorb all costs that were advanced as well as the value of their time.

Although the parties settled this case in the pre-trial stage, Class Counsel has invested a substantial amount of time and resources investigating and litigating this action. *Id.* ¶ 12. Many of the tasks performed by Class Counsel are not evident based solely upon a review of the docket in this matter, as much of the litigation of this action took place outside the courtroom. *Id.*

Tasks performed by Class Counsel thus far include: (1) investigating the claims; (2) meeting and communicating regularly with Plaintiffs, including traveling to Iowa meet with Plaintiff Ashley Schmidt in person; (3) researching and drafting the complaint and an amended complaint; (4) reviewing Plaintiffs' documents and preparing them for production; (5) drafting discovery requests and a protective order; (6) drafting responses to Defendant's written discovery; (7) retaining and consulting with an expert; (8) researching and conferring with defense counsel regarding the stipulation to transfer the case; (8) preparing for and attending the Rule 26(f) conference; (9) drafting a case management plan and Electronically Stored Information ("ESI") supplement; (10) meeting and conferring with Defendant's counsel regarding ESI issues; (11) preparing for and attending the scheduling conference; (12) corresponding with Class Members and

potential additional plaintiffs; (13) researching and drafting a response to Defendant's motion to stay the case; (14) traveling to, preparing for, and arguing at the hearing on Defendant's motion to stay; (15) exchanging and reviewing pre-mediation discovery; (16) researching and drafting two mediation briefs; (17) preparing for and participating in two separate mediation sessions; (18) engaging in extended settlement negotiations with Defendant; (19) drafting the Settlement Agreement and class notices; (20) researching and drafting the preliminary approval brief; (21) researching and drafting two supplemental briefs and numerous notices of supplemental authority in support of preliminary approval; (22) traveling to, preparing for, and arguing at the preliminary approval hearing; (23) developing and maintaining the Settlement website; (24) overseeing administration of the Settlement; and (25) responding to calls from Class Members with questions about the Settlement. *Lukas Decl. ¶ 4.*

Class Counsel's fee entries demonstrate the amount of time devoted to each of these tasks and how Class Counsel's lodestar was calculated. *See Drake Decl., Ex. A; Lukas Decl.*, Ex. A*; Lyngklip Decl.*, Ex. A. To date, Class Counsel's combined lodestar is $326,391.63. *Drake Decl.* ¶ 14; *Lukas Decl. ¶* 6. This lodestar amount does not include numerous hours spent on purely administrative matters.[3]

---

[3] More than 39 hours ($7,593.25 in lodestar) spent on administrative matters or other, similar tasks were excluded from Class Counsel's cumulative lodestar. *Lukas Decl.* ¶ 6.

Class Counsel also anticipates contributing additional time and effort to this case if the Settlement is finally approved. *Drake Decl.* ¶ 16. Additional tasks Class Counsel expects to perform include continuing to oversee the administration of the Settlement, researching and drafting final approval papers, preparing for the final fairness hearing, and traveling to and arguing at the final fairness hearing. *Id.*

Importantly, Class Counsel's lodestar also does not reflect the full extent of Class Counsel's efforts outside of this case that ultimately benefited the Class. For example, Class Counsel has expended dozens of hours researching standing issues and monitoring cases interpreting *Spokeo*. *Id.* ¶ 18. Class Counsel monitors every new FCRA case that is filed in federal court on a daily basis. *Id.* Class Counsel has tracked every such case that has resulted in any litigation around standing, and has compiled a comprehensive compendium of all post-*Spokeo* district court opinions in FCRA cases. *Id.* Class Counsel has also monitored every appellate court decision mentioning *Spokeo*, including both FCRA and non-FCRA cases, and has compiled a compendium of those cases as well. *Id.* These efforts, none of which were specifically billed to this case, but each of which consumes a significant amount of Class Counsel's time, provided tremendous benefits to the Class. They enabled Class Counsel to negotiate a substantial and meaningful settlement of this case, by comparing it to other FCRA cases, and by distinguishing it from other cases that settled for less. They also allowed Class Counsel to effectively and

efficiently brief the standing issues that arose during preliminary approval and that may arise again at final approval, and to effectively assess the reasonability of the recovery in this matter. They also motivated Class Counsel to negotiate a settlement that would persist no matter the outcome of *Spokeo*, due to the provision in Paragraph 77 that requires the Settlement to be presented in an alternative jurisdiction should the need arise. None of these efforts are reflected in Class Counsel's time records in this case (or in any other case). Class Counsel's past successes, experience, and virtually unparalleled knowledge of the FCRA, FCRA cases, and the state of the law regarding standing under the FCRA allowed Class Counsel to reach a favorable Settlement with efficiency and appropriate risk analysis.

To date, Class Counsel has also collectively incurred $37,487.22 in out-of-pocket litigation costs. *Id.* ¶ 15. All of these costs were necessarily incurred and are of the type typically reimbursed by paying clients. *Id.* The estimated costs of settlement administration in this matter (which are not included in the litigation cost totals) are anticipated not to exceed $243,216, plus the actual costs of postage, and were also reasonably incurred. *Id.* ¶ 17.

## III.  CLASS REPRESENTATIVES' PARTICIPATION IN THE CASE

Plaintiffs have played a valuable role in bringing this litigation to a successful conclusion. *Id.* ¶ 19. Among other things, Plaintiffs: (1) met with Class

Counsel at the outset of the case; (2) assisted with Counsel's investigation of the facts; (3) reviewed the complaint prior to filing; (4) worked with Counsel to respond to written discovery; (5) produced documents relating to their applications with Defendant; (6) consulted with Class Counsel during the course of Settlement negotiations; (7) reviewed and approved the final Settlement Agreement; and (8) regularly communicated with Class Counsel and provided input and answers to questions whenever needed. *Hillson Decl. ¶ 4*; *Bohler Decl. ¶ 4*; *Schmidt Decl. ¶ 4*. Plaintiffs also anticipate submitting declarations in support of final approval of the settlement. *Hillson Decl. ¶ 5*; *Bohler Decl. ¶ 5*; *Schmidt Decl. ¶ 5*.

In sum, Plaintiffs have actively engaged in discovery and settlement negotiations and have had frequent correspondence with Class Counsel to stay abreast of developments in the case. *Drake Decl. ¶ 19*. The Settlement's allowance for service payments of up to $2,500 reflects the Class Representatives' initiative in pursuing this action, the risks associated with attaching their names to this litigation, and the time they have invested in the case.

## ARGUMENT

## I.   THE COURT SHOULD APPROVE THE REQUESTED ATTORNEYS' FEES

In this case, the requested award fairly and reasonably compensates Class Counsel. The requested fee of 25% of the Settlement Fund is consistent with the benchmark percentage in this circuit and is *less* than the amount authorized in the

Settlement Agreement. Class Counsel invested significant resources in this case with the possibility of no recovery whatsoever. Due in no small part to their skill, experience, and past success litigating similar claims, Class Counsel was able to efficiently resolve this case in a Settlement that provides significant relief to Class Members, after extensive negotiations. The Parties' ability to reach the Settlement without much protracted litigation or dispositive motion practice demonstrates Class Counsel's efficient use of resources and recognizes the risks and expenses of litigation and trial, as well as the benefits of Settlement. Notably, Class Counsel achieved these benefits for the Class even in the shadow of *Spokeo*—which was pending in the Supreme Court at the time of the Settlement and which Magistrate Judge Patti stated had a "high potential" to *completely dispose* of Plaintiffs', and the Class's, claims. Order Granting Motion to Stay, *ECF No. 29*.

"[A] litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). "When awarding attorney's fees in a class action, a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved." *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993). In common fund cases, the Sixth Circuit "require[s] only that awards of attorney's fees be reasonable under the circumstances." *Moulton v. U.S. Steel*

*Corp.*, 581 F.3d 344, 352 (6th Cir. 2009) (internal quotations omitted). Courts may address the following factors to determine the reasonableness of an attorneys' fee award:

> (1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides.

*Id.* at 352 (quoting *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996)). As discussed below, these factors demonstrate that an award of 25% of the Settlement Fund is reasonable and should be granted.

### A.   The Court Should Apply the Percentage Method to Determine a Reasonable Fee

In class action settlements involving common funds, the Sixth Circuit gives courts discretion in choosing the "appropriate method for calculating attorney's fees in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases before them." *Rawlings*, 9 F.3d at 516. There is, however, a clear trend toward awarding a percentage of the fund. *Id.* at 515-16; *Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261, 1279 (S.D. Ohio), *aff'd*, 103 F.3d 128 (6th Cir. 1996), and *aff'd*, 102 F.3d 777. Indeed, the Supreme Court has recognized that, under the "'common fund doctrine' . . . a reasonable fee is based

on a percentage of the fund bestowed on the class." *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984).

The percentage approach to awarding fees is appropriate even if the underlying claims were brought under a fee-shifting statute. District courts in this circuit—including this Court—frequently apply the percentage method in common fund settlements of claims under fee-shifting statutes. *See, e.g.*, *Underwood v. Carpenters Pension Trust Fund—Detroit & Vicinity*, No. 13-CV-14464, 2017 WL 655622, at *13 (E.D. Mich. Feb. 17, 2017) (stating that the "percentage of fund method is appropriate" in a class settlement under ERISA); *Clevenger v. Dillards, Inc.*, No. C-1-02-558, 2007 WL 764291, at *1 (S.D. Ohio Mar. 9, 2007) ("[R]ecovery of common fund fees is not precluded where a fee-shifting statute applies"). Several Courts of Appeals have explicitly held that the common fund doctrine is applicable in class action settlements involving fee-shifting statutes. *See Staton v. Boeing Co.*, 327 F.3d 938, 967 (9th Cir. 2003); *Brytus v. Spang & Co.*, 203 F.3d 238, 246 (3d Cir. 2000); *Florin v. Nationsbank*, 34 F.3d 560, 564 (7th Cir.1994).[4]

---

[4] The two cases cited in the Court's preliminary approval Order (*ECF No. 55*, at 20) do not require the Court to apply a lodestar approach. The Settlement in *Yeagley v. Wells Fargo & Co.* did not involve a common fund, and the Ninth Circuit specifically noted that the percentage method is appropriate where the settlement involves a common fund. 365 Fed. App'x 886, 887 (9th Cir. 2010). In *Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 259-60 (E.D. Pa. 2011), the court suggested that the lodestar method was often applied in settlements involving fee-

The percentage approach is preferable here in light of the unique characteristics of this case and of class actions generally. *See Rawlings*, 9 F.3d at 516. The percentage method "more accurately reflects the results achieved." *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 279 (6th Cir. 2016). It also "decreases the burden imposed on the Court by eliminating a full-blown, detailed and time consuming lodestar analysis while assuring that the beneficiaries do not experience undue delay in receiving their share of the settlement." *Stanley v. U.S. Steel Co.*, No. 04-74654, 2009 WL 4646647, at *1 (E.D. Mich. Dec. 8, 2009). Use of the percentage method also promotes efficiency and removes incentives for lawyers to run up hours. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005); *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986). In sum, the percentage method best aligns the interests of the lawyer and the client. *See Wal-Mart*, 396 F.3d at 121 (concluding the percentage approach "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation," whereas the "lodestar create[s] an unanticipated disincentive to early settlements") (quotations omitted).

The percentage method is also appropriate in the unique circumstances of this case. Class Counsel took this case on a contingent fee basis. *Drake Decl. ¶ 8.*

---

shifting statutes, but stated that it was not required. To the contrary, the Third Circuit explicitly allows use of the percentage method in common-fund settlements where the underlying claims involve fee-shifting statutes. *Brytus*, 203 F.3d at 246.

The percentage method reflects the realities of the private marketplace, where contingent-fee attorneys are routinely compensated based on a percentage of the recovery. *Manners v. Am. Gen. Life Ins. Co.*, No. CIV.A. 3-98-0266, 1999 WL 33581944, at *29 (M.D. Tenn. Aug. 11, 1999).

Importantly, this is not a case where Class Counsel settled early in the hopes of garnering a larger fee—the type of scenario that reflects a possible disadvantage to the percentage approach. *See Rawlings*, 9 F.3d at 516; *Underwood*, 2017 WL 655622, at *14. Instead, two key factors resulted in the relatively early settlement here: (1) Class Counsel's experience litigating these types of cases, and (2) the major risks posed by the need to prove willfulness and a possible adverse ruling in *Spokeo*, which was pending in the Supreme Court at the time of the Settlement. Indeed, Magistrate Judge Patti noted in the order staying this case that *Spokeo* had a "high potential to be completely dispositive of the instant case." *ECF No. 29*. Under these circumstances, settling this case before the *Spokeo* opinion was issued was in the best interest of Class Members.[5] As such, the primary disadvantage of the percentage method is inapplicable here.

Given the circumstances of this case and of class actions generally, the Court should apply the percentage approach to award a reasonable attorneys' fee.

---

[5] To protect against the risks *Spokeo* posed, the Settlement Agreement included a provision allowing the Settlement to be enforced in another court of competent jurisdiction, had this Court determined that Plaintiffs lacked standing. *Settlement Agreement ¶ 77*.

17

### B.     The Award Reasonably Compensates Class Counsel for the Value Obtained for the Class

Both the monetary and nonmonetary benefits of the Settlement warrant the requested amount of fees, considering the range of recovery available, the risks of proceeding with litigation, and typical percentages awarded in other, similar cases.

In this case, the potential damages per Class Member ranged from $100 to $1,000. 15 U.S.C. § 1681n(a)(1). Under the Settlement, assuming a 100% claims rate, Class Members will receive an average per-capita gross recovery of $30.50.[6] This is well in line with recoveries in other settlements of FCRA stand-alone disclosure claims. *See, e.g.*, *Aceves v. Autozone Inc.*, No. EDCV 14-2032-VAP (DTBx), ECF No. 58 (C.D. Cal. Nov. 18, 2016) ($20 per disclosure class member); *Foltz v. Guitar Center Stores, Inc.*, No. 2:14-cv-04308-NKL, ECF Nos. 41 & 48 (W.D. Mo. July 10, 2015 & Dec. 30, 2015) ($35 gross recovery per class member); *Landrum v. Acadian Ambulance Serv., Inc.*, No. 14-cv-1467, ECF No. 37 (S.D. Tex. Nov. 5, 2015) ($10 per disclosure class member); *Patrick v. Interstate Mgmt. Co., LLC*, No. 8:15-cv-1252-T-33AEP, ECF Nos. 42 & 49 (M.D. Fla. Jan. 14, 2016 & Apr. 29, 2016) ($16.40 gross recovery per disclosure class member). The recovery is even more impressive in light of the significant risks to recovery at the time of Settlement: namely, the pendency of *Spokeo* in the Supreme Court, and the

---

[6] In reality, a claims rate of 100% is unlikely, and Class Members who submit claims will receive considerably more. For example, a claims rate of 15% would result in an average per-capita gross recovery of about $203.

likely difficulties of proving willfulness. *See infra* at 25-26 (explaining the risks to recovery); Memo in Supp. of Preliminary Approval, ECF No. 37, at 28-31 (elaborating on these risks).

The Settlement also includes significant nonmonetary benefits.[7] First, the Settlement provides a unique mechanism for Class Members to easily request copies of their background checks. This allows Class Members and other Kelly employees and applicants to more easily learn what is being reported about them and to correct any errors, improving their future employment prospects. Under the Settlement, Defendant has also agreed to cease its past practice of including a liability release in its disclosures. *Settlement Agreement* ¶ 42. This ensures that, going forward, the disclosure fulfills its purpose by clearly and succinctly informing applicants that a consumer report will be procured. This injunctive relief is significant, given there is disagreement among courts whether injunctive relief is even available under the FCRA. *See Greear v. Equifax Info. Servs., LLC*, No. 14-11988, 2014 WL 3809475, at *1 (E.D. Mich. Aug. 1, 2014) (citing cases).

The requested percentage of the Settlement Fund is well within reason and is consistent with the "reasonable expectations on the part of plaintiffs' attorneys as to their expected recovery." *Rawlings*, 9 F.3d at 516. Fee awards in other common

---

[7] The Court may consider these nonmonetary benefits when evaluating a reasonable fee. *See, e.g.*, *In re Skechers Toning Shoe Prod. Liab. Litig.*, No. 3:11-MD-2308-TBR, 2013 WL 2010702, at *10 (W.D. Ky. May 13, 2013) (considering injunctive relief in determining fee award).

19

fund settlements demonstrate that courts in the Sixth Circuit routinely award fees at or above 25%. *See Underwood*, 2017 WL 655622, at *15 (awarding 28% of the common fund); *In re Packaged Ice Antitrust Litig.*, No. 08-MDL-01952, 2011 WL 6209188, at *19 (E.D. Mich. Dec. 13, 2011) ("30% appears to be a fairly well-accepted ratio . . . ."); *Fournier v. PFS Investments, Inc.*, 997 F. Supp. 828, 832 (E.D. Mich. 1998) ("The 'benchmark' percentage . . . has been 25% [of the fund] . . . ."); *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 372 (S.D. Ohio 1990) ("Fee awards in common fund cases generally are calculated as a percentage . . . ranging from 20 to 50 percent. . . ."). In fact, courts nationwide frequently award attorneys' fees amounting to 33% of the common fund in FCRA class action settlements. *See, e.g.*, *Johnson v. Midwest Logistics Sys., Ltd.*, No. 2:11-CV-1061, 2013 WL 2295880, at *6 (S.D. Ohio May 24, 2013); *Smith v. Res-Care, Inc.*, No. CV 3:13-5211, 2015 WL 6479658, at *8 (S.D.W. Va. Oct. 27, 2015); *Serrano v. Sterling Testing Sys., Inc.*, 711 F. Supp. 2d 402, 421 (E.D. Pa. 2010). The requested fee is 8% less than the fee awards in these cases—and 8% less than the maximum percentage outlined in the Settlement Agreement and class notices. *Settlement Agreement ¶ 48; ECF Nos. 49-1, 49-2, 49-3.*

The first factor thus weighs in favor of the requested award.

### C.     A Lodestar Cross-Check Confirms the Appropriateness of the Award

A lodestar cross-check confirms that the requested award is reasonable. Performing a cross-check of the requested fees using Class Counsel's lodestar is optional. *Feiertag v. DDP Holdings, LLC*, No. 14-CV-2643, 2016 WL 4721208, at *7 (S.D. Ohio Sept. 9, 2016); *see also Dick v. Sprint Commc'ns Co. L.P.*, 297 F.R.D. 283, 300 (W.D. Ky. 2014) ("The Court emphasizes that a lodestar analysis is unnecessary if the fee does not appear to be excessive as a percentage of the recovery."). But courts in the Sixth Circuit often use a lodestar cross-check to verify the reasonableness of a fee awarded under the percentage approach. *In re Cardinal Health Inc. Sec. Litigations*, 528 F. Supp. 2d 752, 764 (S.D. Ohio 2007).

Class Counsel has attached detailed logs of their time entries showing the work they have performed on this case to date. As the time records indicate, Class Counsel has already logged a combined total of $326,391.63 in billable time at its standard hourly rates. *Drake Decl.* ¶ 14; *Lukas Decl.* ¶ 6. This results in a requested lodestar multiplier of 5.2.

The hours billed represent time spent on tasks that were reasonably necessary to litigate this case. *Drake Decl.* ¶ 12; *Lukas Decl.* ¶ 9. Class Counsel's rates are also reasonable. In determining a reasonable hourly rate, courts may look at "national markets, an area of specialization, or any other market they believe is appropriate to fairly compensate attorneys." *McHugh v. Olympia Entm't, Inc.*, 37

21

F. App'x 730, 740 (6th Cir. 2002) (citing *Louisville Black Police Officers Org. v. City of Louisville*, 700 F.2d 268, 278 (6th Cir. 1983)). Class Counsel's hourly rates—ranging from $300 to $675 for attorneys and $150 to $275 for paralegals and staff—reflect Class Counsel's standard hourly rates. *Drake Decl.* ¶ 13*; Lukas Decl.* ¶ 5. These rates are reasonable, particularly given that this was a nationwide class action, Class Counsel's experience litigating similar class actions, and the national scope of Class Counsel's practices. *Declaration of David Blanchard*, ¶¶ 6-11 (attesting to reasonableness of Class Counsel's rates); *Spano v. Boeing Co.*, No. 06-CV-743-NJR-DGW, 2016 WL 3791123, at *3 (S.D. Ill. Mar. 31, 2016) (approving hourly rates of $460 to $998 for attorneys, $309 for paralegals, and $190 for legal assistants); *In re Mercedes-Benz Tele Aid Contract Litig.*, No. 07-CV-2720, 2011 WL 4020862, at *7 (D.N.J. Sept. 9, 2011) (finding reasonable, in consumer class action settlement, hourly rates up to $855 for partners and up to $560 for associates); *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 794 (N.D. Ohio 2010) (approving attorney rates ranging from $325 to $825 and paralegal rates up to $215 in class action); *Laffey Matrix*,[8] http://www.laffeymatrix.com/see.html (last visited Mar. 26, 2017) (setting forth rates between $343 and $826 for attorneys of similar experience levels).

---

[8] The Laffey Matrix is "an official statement of market-supported reasonable attorney fee rates" adopted and updated by the D.C. Circuit Court of Appeals. *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 347 n.3 (6th Cir. 2000).

The requested lodestar multiplier is also within a reasonable range. Courts in this circuit have recognized lodestar multipliers like the one sought here to be reasonable and appropriate and have awarded even higher multipliers when performing a lodestar analysis only as a cross-check. *See In re Prandin Direct Purchaser Antitrust Litig.*, No. 2:10-CV-12141-AC-DAS, 2015 WL 1396473, at *4 n.28 (E.D. Mich. Jan. 20, 2015) (listing cases); *Merkner v. AK Steel Corp.*, 1:09-cv-00423-TSB, ECF No. 79, at 6-7 (S.D. Ohio Jan. 10, 2011) (multiplier of 5.3 in lodestar crosscheck); *Bailey v. AK Steel Corp.*, No. 1:06-CV-468, 2008 WL 553764, at *2 (S.D. Ohio Feb. 28, 2008) (noting that the "normal range" for a lodestar multiplier is "between two and five"); *In re Cardinal Health*, 528 F. Supp. 2d at 767 (multiplier of 5.9 in lodestar crosscheck); *In re Fernald Litig.*, No. C-1-85-149, 1989 WL 267038, at *5 (S.D. Ohio Sept. 29, 1989) (multiplier of 5 in lodestar crosscheck); *In re Beverly Hills Fire Litig.*, 639 F. Supp. 915, 924 (E.D. Ky. 1986) (multiplier of 5 for lead counsel).[9]

The unique circumstances of this case render the multiplier even more reasonable. First, there is a considerable amount of work remaining. To ensure that Class Members have all the key information they need before deciding whether to

---

[9] Courts across the country have also awarded much higher multipliers. *See, e.g.*, *New Eng. Carpenters Health Benefits Fund v. First Databank*, No. 05-cv-11148-PBS, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (8.3 multiplier); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 2:03-CV-04578, 2005 WL 1213926, at *18 (E.D. Pa. May 19, 2005) (15.6 multiplier).

object or opt out of the Settlement, Class Counsel sought a deadline for this fee application that was two weeks prior to the opt-out and objection deadline—and more than four months before the final approval hearing. *Settlement Agreement* ¶ 72. Thus, Counsel's time entries and lodestar to date do not include time Class Counsel will spend drafting the final approval papers, preparing for and attending the final approval hearing, and overseeing the ongoing administration of the Settlement. *See Drake Decl.* ¶ 16. Class Counsel will supplement this request with a final lodestar number shortly before the final approval hearing. Furthermore, the fee records in this case do not reflect work Class Counsel performed outside this case that ultimately benefited the Class and the Settlement. *See supra*, at 10-11.

Thus, the second factor supports the requested award.

### D.   Class Counsel Took This Case on a Contingent Fee Basis Despite Significant Risks

The requested fee award is even more reasonable considering the risks that Class Counsel assumed in undertaking the representation on a contingent fee basis. This is "an important factor in determining the fee award." *Stanley v. U.S. Steel Co.*, 2009 WL 4646647, at *3. Indeed, "[s]everal courts consider the risk of non-recovery the most important factor in the fee determination." *In re Cardinal Health*, 528 F. Supp. 2d at 766.

At the time Class Counsel took on this case, the outcome was uncertain. There were very few court opinions addressing the meaning of 15 U.S.C.

§ 1681b(b)(2). *Drake Decl.* ¶ 9. To Class Counsel's knowledge, there were no such cases within the Sixth Circuit. *Id.* ¶ 9. Class Counsel thus contributed more than 830 hours to this case with the very real possibility of no fee recovery at all.

These risks come into even sharper focus taking into account the FCRA's willfulness requirement. The FCRA is not a strict liability statute. *Dalton v. Capital Associated Indus.*, 257 F.3d 409, 417 (4th Cir. 2001). Because Plaintiffs did not allege actual damages, they would have been required to prove that Defendants acted willfully. *See* 15 U.S.C. § 1681n(a). To prevail, Plaintiffs would have had to show not only that their interpretation of the FCRA was correct, but that Defendant's interpretation of the statute was objectively unreasonable. *See Safeco Ins. Co. v. Burr*, 551 U.S. 47, 69 (2007). To challenge the willfulness element, Defendants likely would have relied on the lack of cases directly on point in the Court of Appeals at the time of the pertinent conduct. *See id.* at 70. This, too, increased the risk that Class Counsel would recover nothing.

For these reasons, the third factor supports the requested award.

### E.    The Public Interest Favors Incentivizing Class Counsel's Advocacy

This action and cases like it serve to protect important informational and privacy interests. The FCRA "ensure[s] fair and accurate credit reporting . . . and protect[s] consumer privacy." *Id.* at 52. Congress amended the Act in 1996 due to two key concerns: (1) that employers' practices relating to procuring and using

25

consumer reports "create[d] an improper invasion of privacy," S. Rep. 104-185, at 35 (1995), and (2) the "significant amount of inaccurate information . . . being reported by consumer reporting agencies and the difficulties that consumers faced getting such errors corrected," S. Rep. No. 108-166, at 5-6 (2003). To address these concerns, Congress implemented additional protections, including § 1681b(b)(2)'s disclosure requirement. *See* Pub. L. 104-208.

The first step to give effect to the FCRA's protections for job applicants and employees is to require employers to disclose that they are procuring a consumer report in a clear, succinct, and understandable format.

> If information is not provided in a clear and usable form, it may actually make people less knowledgeable than they were before, producing overreactions, or underreactions, based on an ability to understand what the information actually means. People also face a pervasive risk of 'information overload,' causing consumers to treat a large amount of information as equivalent to no information at all. Certainly this is true when disclosure campaigns are filled with details that cannot be processed easily.

Cass R. Sunstein, *Informational Regulation and Informational Standing: Akins and Beyond*, 147 U. Pa. L. Rev. 613, 627-28 (1999).

Here, Plaintiffs alleged that Defendant's release included a liability waiver and other extraneous information, which not only can result in "information overload," preventing applicants from understanding their rights, but also can chill individuals' enforcement of those rights based on a belief that they have waived

26

them. Accordingly, there is an important societal interest at stake, which weighs in favor of the requested fee.

### F.      The Complexity of the Case Supports the Requested Fee

Although the factual issues may appear straightforward at first blush, several factors rendered this case complex.

First, class actions are inherently complex. *In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 504 (E.D. Mich. 2008). Compared to individual cases, class actions by their very nature involve unique procedural hurdles, more extensive discovery, and larger stakes, all of which affect the way the case is litigated from the outset.

Second, the FCRA's state-of-mind requirement increased the complexity of this case. As explained above, to prevail on their claims, Plaintiffs would have had to prove that any violation of the statute was willful. This is no easy task. "[P]roving wilfulness may well be difficult in the context of large corporate employers where the locus of particular decision-making is often elusive." *Ellis v. Glover & Gardner Const. Co.*, 562 F. Supp. 1054, 1061 (M.D. Tenn. 1983) (quoting *Stewart v. Travelers Corp.*, 503 F.3d 108, 113 (9th Cir. 1974)).

Third, standing issues also increased the complexity of this case. *Spokeo* raised a complicated jurisdictional issue, which Class Counsel addressed during the motion to stay, in the Settlement Agreement itself, and again in the motion for

preliminary approval. The law on standing post-*Spokeo* developed rapidly, requiring Class Counsel to monitor case developments and formulate novel arguments for purposes of preliminary approval of the Settlement.

Importantly, each of these risks was not gradated, but binary. Without winning on class certification, willfulness, and standing, the Class and Class Counsel would have recovered *nothing*. These complexities support the reasonableness of the fee.

### G.    Class Counsel Are Skilled and Experienced in Litigating Similar Cases

Class Counsel's qualifications are set forth in their firm resumes and declarations, *see ECF Nos. 37-3, 37-5, 37-6*; *Drake Decl.*, Exs. C-D; *Lukas Decl.* Ex. C, *Lyngklip Decl. ¶¶ 4-28*, and Memorandum in Support of Preliminary Approval, *see ECF No. 37*, at 38, which are incorporated herein. As these qualifications demonstrate, Class Counsel is highly skilled in handling major complex litigation and has extensive experience litigating consumer and employment class actions. Class Counsel and their firms frequently have been recognized by courts and other institutions for their proficiency, expertise, and professionalism. *ECF Nos. 37-3, 37-5, 37-6; Drake Decl.*, Exs. C-D; *Lukas Decl.* Ex. C, *Lyngklip Decl. ¶¶ 4-28*.

Class Counsel also hails from a select number of firms that have a depth of experience litigating FCRA class actions. The attorneys who worked on this case

have achieved a remarkable number of favorable decisions in other FCRA stand-alone disclosure cases.[10] These victories not only demonstrate that Class Counsel's skill level supports the requested fee, but also positioned the Class for a strong Settlement in this case.

Defense counsel is also well respected and highly skilled. Seyfarth Shaw has more than 900 attorneys and is particularly well respected in the employment defense bar. *See* http://www.seyfarth.com/ (last visited March 27, 2017). The attorneys who represented Kelly on this case specialize in complex employment and FCRA litigation and are preeminent in those fields.

Counsel's skill and standing thus support the requested award.

## II.   THE REQUESTED COSTS ARE REASONABLE AND SHOULD BE GRANTED

Class Counsel also seeks reimbursement of its documented, out-of-pocket litigation expenses and approval of the costs of settlement administration.

"Under the common fund doctrine, 'class counsel is entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and settlement, including expenses incurred in connection

---

[10] *See, e.g.*, *Terrell v. Costco Wholesale Corp.*, No. C16-1415JLR, 2017 WL 951053, at *1 (W.D. Wash. Mar. 10, 2017); *Robrinzine v. Big Lots Stores, Inc.*, 156 F. Supp. 3d 920 (N.D. Ill. 2016); *Johnson v. Casey's Gen. Stores, Inc.*, 116 F. Supp. 3d 944 (W.D. Mo. 2015); *Harris v. Home Depot, U.S.A., Inc.*, No. 15-cv-01058-VC, 2015 WL 4270313 (N.D. Cal. June 30, 2015); *Lengel v. HomeAdvisor, Inc.*, 102 F. Supp. 3d 1202 (D. Kan. 2015); *Avila v. NOW Health Group, Inc.*, No. 14 C 1551, 2014 WL 3537825 (N.D. Ill. July 17, 2014); *Singleton v. Domino's Pizza, LLC*, No. DKC 11-1823, 2012 WL 245965 (D. Md. Jan. 25, 2012).

with document production, consulting with experts and consultants, travel and other litigation-related expenses.'" *N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 244 (E.D. Mich. 2016) (quoting *New England Health Care Emp. Pension Fund v. Fruit of the Loom*, 234 F.R.D. 627, 634-35 (W.D. Ken. 2006)). In determining whether expenses are compensable out of a common fund, courts consider "whether the particular costs are the type routinely billed by attorneys to paying clients in similar cases." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 535 (E.D. Mich. 2003).

As Counsel's expense records show, all of the $37,487.22 in costs were reasonable and necessary to the successful conclusion of this litigation. *Drake Decl.*, Ex. B*; Lukas Decl.*, Ex. B. They include expenses for filing fees, computerized research, service of process, photocopying, expert consultants, mediation services, travel, and postage. These types of expenses are routinely billed by attorneys to paying clients in consumer and employment cases.

Class Counsel also seeks the Court's approval to pay Settlement Administration costs, not to exceed $243,216 plus the actual costs of postage, out of the Settlement Fund.[11] *See Newberg on Class Actions* § 12:20 (5th ed.) ("The[] costs of paying the claims administrator, processing the claims, providing notice to

---

[11] The Settlement Administrator, Epiq, has agreed that the costs of administration will not exceed $243,216 plus the actual costs of postage (which Class Counsel will provide at the final approval hearing). *Drake Decl.* ¶ 17.

the class, and generally administering the settlement is typically deducted from the settlement fund."). In choosing a settlement administrator to handle the notice and claims process in this matter, Class Counsel sought competitive bids from three reputable firms and determined that Epiq's bid was fair and reasonable. *Drake Decl.* ¶ 17. The requested settlement administration costs cover, among other things, expenses incurred or estimated to be incurred for mailing notices, Spanish translation, processing claims and opt-outs, issuing checks, postage, corresponding with Class Members, issuing tax documents, and phone support. *Id.* Given that this settlement involved 221,216 Class Members, the requested administration costs are fair and reasonable.

Plaintiffs therefore respectfully request that the Court approve distribution of $37,487.22 in litigation costs to Class Counsel and of Settlement Administration costs not to exceed $243,216, plus the actual costs of postage, to Epiq.

## III.  THE COURT SHOULD APPROVE THE REQUESTED CLASS REPRESENTATIVE SERVICE PAYMENTS

Courts in the Sixth Circuit have awarded service payments to class representatives in recognition of the fact that, "absent their willingness to be class representatives in th[e] case, the Class Members likely never would have recovered damages from Defendants as their claims, individually, would not have been worth bringing." *Michel v. WM Healthcare Sols., Inc.*, No. 1:10-CV-638, 2014 WL 497031, at *12 (S.D. Ohio Feb. 7, 2014); *see also Hadix v. Johnson*, 322 F.3d 895,

31

897 (6th Cir. 2003). Courts may look to a three-factor test for such service payments:

> (1) the action taken by the Class Representatives to protect the interests of Class Members and others and whether these actions resulted in a substantial benefit to Class Members; (2) whether the Class Representatives assumed substantial direct and indirect financial risk; and (3) the amount of time and effort spent by the Class Representatives in pursuing the litigation.

*Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250 (S.D. Ohio 1991).

Here, as to the first and third factors, the Class Representatives have diligently represented the interests of Class Members. *Drake Decl.* ¶ 19. Although there have been limited in-court proceedings, the Plaintiffs have expended considerable time and effort performing a number of services without which this case could not have moved forward, including assisting Class Counsel with investigation, reviewing the complaint, responding to written discovery, producing documents, and consulting with Class Counsel during Settlement negotiations. *Hillson Decl.* ¶ 4; *Bohler Decl.* ¶ 4; *Schmidt Decl.* ¶ 4. With regard to the second factor, although Class Representatives did not expend money from their own pocket to litigate this case, they have borne the indirect risks associated with attaching their names and reputations to this litigation, which could have an impact on their future employment prospects.

Importantly, here, the prospect of service payments had no impact on the

total Settlement value, as the service payments were not negotiated until *after* the Parties had reached agreement on the total amount of the Settlement Fund. *Settlement Agreement* ¶ 47; *Drake Decl. ¶ 20.* The requested service payments of $2,500 per Class Representative are modest and similar to or less than awards in analogous cases. *Gascho v. Global Fitness Holdings, LLC*, No. 2:11-cv-436, 2014 WL 1350509, at *26 (S.D. Ohio Apr. 4, 2014) (awarding $5,000 and $3,500 to named plaintiffs where the minimum payment to the class was $1.3 million), *report and recommendation adopted*, No. 2:11-CV-00436, 2014 WL 3543819 (S.D. Ohio July 16, 2014), *aff'd*, 822 F.3d 269; *Michel*, 2014 WL 497031, at * 12 (awarding $3,000 to each named plaintiff in junk fax case involving a settlement fund of $4,375,000). The sum total of the service payments represents only about 0.1% of the Settlement Fund.

Although the requested service payments are several times larger than the amount other Class Members will receive, that is due to the nature of the damages in this case. Whenever class members' damages are small, anything other than a minimal service payment will always be significantly larger than the payment designated for each unnamed class member. Yet it is in these very circumstances that it is most important to separately incentivize class representatives to invest the time and effort required to pursue the litigation to a successful conclusion. *Cf. Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("The policy at the very

core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.").

Plaintiffs recognize that the Sixth Circuit and this Court recently indicated a preference for documentation "in the manner of attorney time sheets" of the time Class Representatives spent on the case. *Shane Group, Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 311 (6th Cir. 2016); *Underwood*, 2017 WL 6555622, at *11. As Class Counsel and Class Representatives unfortunately did not have the benefit of these opinions when they initiated this litigation, such detailed documentation does not exist. But the requested service payments are substantially more modest than those sought in the aforementioned cases. *See Shane Group*, 825 F.3d at 311 (payments between $10,000 and $50,000); *Underwood*, 2017 WL 6555622, at *10 ($15,000 and $7,500 payments). Indeed, courts in this district— including this Court—have awarded similarly modest service payments to Class Representatives post-*Shane Group*, even in the absence of detailed time records. *See, e.g.*, *Underwood*, 2017 WL 6555622, at *12. Thus, the service payments should be granted.

## **CONCLUSION**

Plaintiffs respectfully request that the Court grant Class Counsel and Plaintiffs' request for 25% of the settlement fund as attorneys' fees ($1,687,250),

$37,487.22 in litigation costs, settlement administration costs not to exceed $243,216 plus the actual costs of postage, and service payments to the Class Representatives of $2,500 each.

Respectfully submitted,

NICHOLS KASTER, PLLP

Dated: March 27, 2017

/s/Paul J. Lukas
Paul J. Lukas, MN Bar #22084X*
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
*generally admitted

BERGER & MONTAGUE, P.C.
E. Michelle Drake, MN Bar #0387366*
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Telephone: 215-875-3000
Facsimile: 215-875-4604
emdrake@bm.net
*generally admitted

LYNGKLIP & ASSOCIATES
CONSUMER LAW CENTER, PLC
Ian B. Lyngklip (MI Bar No. P-47173)
24500 Northwestern Hwy, Suite 206
Southfield, MI 48075
Telephone: 248-208-8864
ian@michiganconsumerlaw.com

ATTORNEYS FOR PLAINTIFFS