UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| LASANDRA HILLSON,<br>STEVEN BOHLER, and<br>ASHLEY SCHMIDT,<br>*individually and as proposed representatives*<br>*of a class*,<br><br>      Plaintiffs,<br><br>v.<br><br>KELLY SERVICES INC.,<br><br>      Defendant. | Case No. 2:15-cv-10803<br>Honorable Laurie J. Michelson<br>Magistrate Judge Anthony P. Patti |

**OPINION AND ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR ATTORNEY'S FEES, COSTS, AND CLASS REPRESENTATIVE SERVICE PAYMENTS [60] AND GRANTING PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT [69]**

When Plaintiffs Lasandra Hillson, Steven Bohler, and Ashley Schmidt applied for a job with Defendant Kelly Services Inc., they were asked to sign a form that disclosed to them that Kelly might obtain a consumer report to assess their employability. But the form also included a waiver and disclaimer. Plaintiffs say that by including this information on the form, Kelly violated the "stand-alone disclosure" provision of the Fair Credit Reporting Act. That provision of the FCRA prohibits employers from procuring consumer reports unless they first disclose that fact "in a document that consists solely of the disclosure." *See* 15 U.S.C. § 1681b(b)(2)(A)(i). Plaintiffs further maintain that thousands of people who submitted applications to Kelly were asked to sign a similar form. They thus seek to represent a class of 221,221 individuals.

Following some formal discovery, two mediation sessions (with two retired federal judges), and additional negotiations, Plaintiffs and Kelly have reached a settlement. Under their

agreement, Kelly will provide Plaintiffs and the class with several benefits. The primary one is that Kelly will create a settlement fund of $6,749,000, none of which will revert to Kelly. (*See* R. 37, PID 520, 522.) The settlement agreement contemplates that up to 33% of the settlement fund will go to class counsel for fees. Costs, class-administration expenses, and representation payments to Plaintiffs will also be deducted from the fund. (*See* R. 37, PID 522.) In addition, Kelly has agreed to remove the waiver and disclaimer language from its disclosure forms for a period of five years (or until a material change in the law) and to provide, upon request, each class member (and Kelly temporary employees) a copy of the consumer report that Kelly obtained. (*See* R. 37, PID 520.)

In exchange for these benefits, the settlement agreement grants Kelly a release of claims. In particular, class members who do not opt out of the settlement will forever release any and all claims "arising out of or relating directly or indirectly in any manner whatsoever to the facts alleged or asserted in the Complaint and Amended Complaint and which relate directly or indirectly in any manner whatsoever to Defendant's procurement of consumer reports, including but not limited to any and all claims under 15 U.S.C. §§ 1681b(b)(1), 1681b(b)(2) and 1681b(f) of the Fair Credit Reporting Act and any analogous state law claims." (R. 49, PID 776–77.)

In January 2017, this Court preliminary found the settlement agreement to be fair. *See Hillson v. Kelly Servs. Inc.*, No. 2:15-CV-10803, 2017 WL 279814, at *18 (E.D. Mich. Jan. 23, 2017). In reaching that conclusion, the Court conducted a very thorough analysis of the many factors that indicate whether a settlement is fair or not. *See Hillson*, 2017 WL 279814, at *6–14.

Only three of the key fairness factors were not adequately addressed in this Court's preliminary approval opinion. The Court did not address "the reaction of absent class members" to the settlement, *Vassalle*, 708 F.3d at 754, because the claims process had not yet begun. And

the Court, while hinting that attorney's fees amounting to 33% of the settlement fund were high, did not fully address the issue because Plaintiffs had not yet formally petitioned the Court for attorney's fees and costs. *Hillson*, 2017 WL 279814, at *9. The Court also hinted that the requested service payments to the class representatives were high, but did not reach that conclusion: "while the $2,500 incentive award to each Plaintiff does not on its face indicate that Plaintiffs failed to settle in the best interests of the entire class, the Court directs the parties to either reconsider this award or further justify it when they seek final approval." *Id.* at *11.

Since this Court issued its preliminary approval opinion, the period for opting out, objecting, and making claims has closed. And Plaintiffs have formally petitioned the Court for attorney's fees, costs, settlement administration expenses, and representative service payments. (R. 60.) They have also filed a motion for final approval of the settlement (R. 69) and the Court has held the final approval hearing on August 2, 2017. Thus, the Court can now address the three fairness factors that were not fully addressed in this Court's preliminary approval opinion.

The reaction of the class members strongly indicates that the settlement is fair. Of the over 221,000 notices sent, there were only 10 timely opt-outs and one objection. (R. 69, PID 1176.) The one objection did not claim that the settlement was not fair to the class (or herself), but only asserted that Kelly should not be "penalized" for running background checks. (R. 59.) Over 50,000 people (about 23% of the class) made claims, which appears to be a high claim rate. *See* (R. 69, PID 1176, 1188); *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 289 (6th Cir. 2016) (noting that expert who had administered 3,000 settlements had testified that "response rates in class actions generally range from 1 to 12 percent, with a median response rate of 5 to 8 percent"). Accordingly, by their conduct, the class has indicated that they believe the settlement is fair. (The high claim rate also confirms this Court's prior assessment that the notice

plan was sufficient, that the claims procedure was not onerous, and that the release was not too broad. *See* Newberg on Class Actions § 13:15 (5th ed.) (listing fairness factors).)

The issue of attorney's fees is more involved.

In class-action settlements resulting in a common fund, a court may exercise its equitable powers to award attorney's fees from the fund. *See Haggart v. Woodley*, 809 F.3d 1336, 1352 (Fed. Cir. 2016). There is a common fund here, but because the FCRA has a fee-shifting provision, this case could be an exception. *See Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 254 (7th Cir. 1988) ("[W]hen a case is initiated under a statute with a fee-shifting provision and is settled with the creation of a common fund, the question may arise whether statutory fee principles should govern in whole or in part the attorney fee award."). In *Skelton*, the Court found significant that the fee-shifting provision at issue provided fees to the party "finally prevail[ing]" in the action. 860 F.2d at 256. Thus, the fee-shifting provision, "by its terms," did not "apply to a fee determination in a case settled in a common fund." *Id.* The FCRA similarly contemplates an award of fees "in the case of any successful action" and is silent on settled cases. *See* 15 U.S.C. §§ 1681n, 1681o. So the Court will award attorney's fees from the common fund. *See McKeage v. TMBC, LLC*, 847 F.3d 992, 1003 (8th Cir. 2017) (collecting cases and explaining that "the presence of a fee-shifting statute precludes a common fund award only when that result is required by the statutory scheme involved"); *cf. Haggart v. Woodley*, 809 F.3d 1336, 1357 (Fed. Cir. 2016) (finding fee award from common fund improper where statutory fee provision specifically mentioned settlement, that Government would pay attorney's fees, and that fees would be those "actually incurred").

The question thus becomes which common-fund method to use: lodestar or percentage-of-recovery. Under the lodestar approach, a court determines a reasonable hourly rate and hours

reasonably expended and multiplies the two; the resulting lodestar may then be enhanced by a multiplier to "reflect relevant considerations peculiar to the subject litigation." *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 279 (6th Cir. 2016). Under the percentage-of-recovery approach the court awards counsel a portion of the settlement fund. *See id.* Both approaches have benefits and drawbacks. The percentage-of-recovery approach is "easy to calculate," "establishes reasonable expectations on the part of plaintiffs' attorneys," and "encourages early settlement." *Id.* The drawback is that attorneys may be encouraged to settle too early, thereby increasing their award relative to work invested. *See id.* The lodestar approach has the benefit of greater accountability (counsel must track their time) and "encourages lawyers to assess the marginal value of continuing work on the case." *Id.* "But 'the lodestar method has been criticized for being too time-consuming of scarce judicial resources.'" *Id.*

Here, the percentage-of-recovery approach is a reasonable choice. Counsel inform the Court that they settled early because they recognized difficulties in proving that Kelly willfully violated the FCRA and because this case may have been dismissed for lack of Article III standing. (R. 60, PID 918.) Moreover, the recovery on a per-class-member basis seems fair given the harm at issue, suggesting that early settlement was in the class members' interest. And Plaintiffs negotiated fees and representative service payments only after reaching a settlement with Kelly. (R. 37, PID 521–22.) Further, this Court's review of hundreds of time entries (many of which the Court has little means of questioning (e.g., "team meeting")) would not be in the public interest nor, necessarily, lead to a more accurate fee award. Finally, the Court will cross-check its percentage-of-recovery award against the lodestar counsel has provided, thereby gaining some of the benefits of that alternative approach.

5

Courts often, "but by no means invariably," analyze a host of factors in deciding whether a particular percentage of the fund is a reasonable award of attorney's fees. *See Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009) (listing six factors); *Barnes v. City of Cincinnati*, 401 F.3d 729, 746 (6th Cir. 2005) (listing twelve factors). The key factors are "the results counsel achieved for the class," "the risks that they bore doing so," and "the quality of their work in light of the complexity of the case." Newberg on Class Actions § 15:77 (5th ed.). The Court considers these factors in turn.

The results counsel achieved for the class were good. The gross recovery (i.e., recovery before fees and other expenses are taken form the fund) is $30 per class member (on average). This appears to be in line with the average per-class-member gross recovery in other settlements of stand-alone disclosure claims. *See Moore v. Aerotek, Inc.*, No. 2:15-CV-2701, 2017 WL 2838148, at *4 (S.D. Ohio June 30, 2017) (per-capita gross recovery of $25 in case involving a stand-alone disclosure claim and a claim that employer did not provide a copy of consumer report), *report and recommendation adopted*, 2017 WL 3142403 (S.D. Ohio July 25, 2017); *Lagos v. Leland Stanford Junior Univ.*, No. 15-CV-04524-KAW, 2017 WL 1113302, at *2 n.1 (N.D. Cal. Mar. 24, 2017) (per-capita gross recovery of $26); *Lengel v. HomeAdvisor, Inc.*, No. CV 15-2198, 2017 WL 364582, at *9 (D. Kan. Jan. 25, 2017) (citing FCRA disclosure cases with per-capita gross recoveries of $33, $40, and $44).[1] And in addition to monetary benefits,

---

[1] Counsel has cited additional settlements of stand-alone disclosure claims in their brief where the per-capita gross recovery was $10, $16.40, $20, and $35. (R. 60, PID 919.)

A number of stand-alone disclosure cases have considerably higher per-capita gross recovery, but the defendant's total liability in those cases was much less there than here. *See Shelton v. Hal Hays Constr., Inc.*, No. EDCV1600360VAPKKX, 2017 WL 1439683, at *7 (C.D. Cal. Jan. 25, 2017) (per-capita gross recovery of $250 but class was only 360 members); *Lengel v. HomeAdvisor, Inc.*, No. CV 15-2198-KHV, 2017 WL 364582, at *9 (D. Kan. Jan. 25, 2017) (per-capita gross recovery of $100 but class was only 1,650 members); *Bailes v. Lineage*

class members are entitled to a copy of the consumer report Kelly obtained. Kelly has also agreed to not use the disclosure form at issue for a time. Further, if this case proceeded to trial, the class members would have likely recovered only $100 each, which is not too far from the $19 per-capita *net* recovery under a settlement that avoids the risk of no recovery. *See Hillson*, 2017 WL 279814, at *8 (discussing likely recovery at trial). Moreover, no class members have objected to the amount of recovery and, as noted, the claim rate was high. This further suggests that counsel achieved good results for the class.

Counsel took on considerable, but not extraordinary, risk in prosecuting this case. Counsel put into this litigation around 950 hours and took on $40,000 in costs. (*See* R. 60, PID 926; R. 70, PID 1224.) This was despite that Plaintiffs faced a considerable challenge in establishing that Kelly willfully violated the FCRA. *See Hillson*, 2017 WL 279814, at *8. Absent a showing of willfulness, Plaintiffs, and therefore counsel, would have recovered nothing. On the other hand, there was developing support for the legal theory of this case prior to settlement. Indeed, Plaintiffs' counsel in this case survived motions to dismiss in at least two other similar cases prior to settlement. *Johnson v. Casey's Gen. Stores, Inc.*, 116 F. Supp. 3d 944, 945 (W.D. Mo. 2015); *Woods v. Caremark PHC, L.L.C.*, No. 4:15-CV-00535-SRB, 2015 WL 6742124 (W.D. Mo. Nov. 2, 2015).

Counsel's quality of work in this case was high. The Court has been impressed with counsel's in-court arguments. And counsel has provided the Court with quality briefing as well. The Court also appreciates that counsel revised the class notices to ensure that they were as clear and complete as possible.

---

*Logistics, LLC*, No. 15-CV-02457-DDC-TJJ, 2016 WL 7242501, at *4 (D. Kan. Dec. 15, 2016) (per-capita gross recovery of $44 but class was only 3,400 members).

This case was not too complex. It involved a single claim involving a single statutory provision and a single form. And several courts had even opined on the stand-alone disclosure requirement at the time this case was filed or soon thereafter. To be sure, proving willfulness would have been challenging as a factual matter, but the nature of the task was not complex. Counsel argues that *Spokeo, Inc. v. Robins*, — U.S. —, 136 S. Ct. 1540 (2016), made this case more complex. (R. 60, PID 928–29.) The Court agrees to an extent. The Article III standing question post-*Spokeo* was difficult. But it is not clear that counsel needed to address it head on. There are state-court forums available for FCRA class actions. Indeed, the settlement agreement accounted for *Spokeo* by including a clause that would have allowed this case to survive in state court. (R. 37, PID 535.) Thus, while *Spokeo* did increase the complexity of this case, it perhaps could have been addressed more simply. Counsel also points out that "class actions are inherently complex." (R. 60, PID 928.) The Court agrees. But this cannot weigh too heavily in the percentage-of-recovery analysis—that analysis presumes a common fund and thus a class action. In all, the Court does not deem this to have been an overly complex case.

Before assessing the collective weight of these factors, one more consideration is critical: the percentage-of-recovery awarded in other cases. In the Ninth Circuit, 25% of the fund, which is what counsel asks for here, is considered a benchmark. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure."); *In re Pac. Enterprises Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) ("Twenty-five percent is the 'benchmark' that district courts should award in common fund cases."). And a study of class actions from 2006 to 2011 revealed that the mean percentage of recovery was 27.1% across class actions and 28.7% in consumer class actions.

Newberg on Class Actions § 15:83 (5th ed.); *see also* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Studies 811, 839 (2010) (providing that for settlements in the range of $4.45 to $7 million, the average attorney's fees award over all class-action settlements in 2006 and 2007 was 27.4%). Several FCRA cases also indicate that 25% or more is reasonable. *See Flores v. Express Servs., Inc.*, No. CV 14-3298, 2017 WL 1177098, at *3 (E.D. Pa. Mar. 30, 2017) ("Upon consideration of percentages granted in similar class action settlements, 32.96% of the total common fund is within the range of awards that support approval."); *Smith v. Res-Care, Inc.*, No. CV 3:13-5211, 2015 WL 6479658, at *7 (S.D.W. Va. Oct. 27, 2015) ("The Court finds 33% is a reasonable amount of the common fund under the percentage of common fund method."); *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 685 (D. Md. 2013) ("Cases involving comparable funds to the $2.5 million settlement fund here have resulted in awards of attorneys' fees in the ranges of 25% to 28% of the common fund.").

With 25% (or more) of the settlement fund as a good starting point for what is reasonable, the Court can now consider the collective weight of the percentage-of-recovery factors. The fact that this case was not too complex points toward a slightly lower percentage of recovery. But the results in this case were good, counsel undertook considerable risk in prosecuting the case, and the quality of counsel's representation was high. All of these factors suggest a higher percentage of recovery would be appropriate. Further, the Court commends counsel for requesting only 25% of the settlement fund despite that the settlement agreement permitted counsel to request up to 33% of the fund. As such, all of the foregoing suggests that an attorney's fees award of 25% of the settlement fund, or $1,687,250, is reasonable.

But a lodestar cross-check suggests otherwise. Even assuming that all of the hours counsel worked on this matter were reasonable, and further assuming that counsel's hourly rates are all reasonable, counsel's lodestar will likely end up around $370,000.[2] This results in a multiplier of about 4.56, i.e., a fee award of 25% of the settlement fund would mean counsel would receive over four-and-a-half times their hourly rate. This seems high. *See* Newberg on Class Actions § 15:89 (5th ed.) (providing that for settlement funds in the range of $4.5 to $7.3 million, mean multiplier was 1.38). Indeed, "[e]mpirical evidence of multipliers across many cases demonstrates that most multipliers are in the relatively modest 1–2 range; this fact counsels in favor of a presumptive ceiling of 4." Newberg on Class Actions § 15:87 (5th ed.). Moreover, the primary reason for awarding a multiplier is to account for the risk counsel undertook in taking the case. *See* Newberg on Class Actions § 15:87 (5th ed.) (providing that the "simple answer" for "why class counsel would ever get a positive multiplier" is that "most class action lawyers undertake class suits on a contingent fee basis"). Here, as discussed, the risk in this case was considerable but not extraordinary. A multiplier of 4 would seem to adequately account for that risk. In applying a lodestar cross-check, courts also take into account the results achieved for the class. While counsel achieved good results for the class, a multiplier higher than 4 would seem reserved for exceptionally good results.

The Court is aware that counsel has cited a number of cases where courts awarded fees equivalent to a multiplier higher than 4.5. (R. 60, PID 924.) But an examination of these cases,

---

[2] In a declaration submitted the day before the preliminary approval hearing, counsel provided that their lodestar was $363,551.63. (R. 70, PID 1225.) The Court has used a higher figure to account for time spent oral argument and any additional work to bring this case to conclusion.

and several others, indicates that large settlement funds were in play. *See* Appendix.[3] This makes sense: even a modest percentage of the fund when the fund is very large will result in a high multiplier unless counsel has expended extraordinary time on the litigation. *See In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 938 (N.D. Ohio 2003) (noting a study that found an average multiplier of 4.50 in cases exceeding $100 million); Newberg on Class Actions § 15:89 (5th ed.) ("[M]ultipliers increase as fund size increases. This is true even though percentages decrease as fund size increases.").

Given the foregoing, the Court believes that a multiplier of 4 is proper in this case. A multiplier of 4 appears to be near the ceiling of reasonable multipliers with a settlement fund of about $7 million. And for the reasons stated, this case does not warrant an award of attorney's fees at the absolute ceiling. A multiplier of 4 also represents 21.5% of the fund, which is close to the 25% counsel has requested. Accordingly, the Court will award counsel $1,454,206.52 in attorney's fees.

Upon review of the documentation supplied by counsel, the Court finds that counsel are entitled to a reimbursement of their costs in the amount of $40,864.60. (*See* R. 61, PID 1021–23; R. 62, PID 1092–96; R. 70, PID 1225, 1231.) Over half these expenses were directed toward the two mediation sessions that led to settlement and no expense jumps out as unnecessary. *See In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 535 (E.D. Mich. 2003) ("Under the common fund doctrine, class counsel is entitled to reimbursement of all reasonable out-of-pocket litigation

---

[3] Some older cases say things like, "[i]n recent years, multipliers of between 3 and 4.5 have been common." *Rievman v. Burlington N. R. Co.*, 118 F.R.D. 29, 35 (S.D.N.Y. 1987); *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988). Tracing these statements back leads to *Municipal Authority of Town of Bloomsburg v. Pennsylvania*, 527 F. Supp. 982 (M.D. Pa. 1981). But there the court explained, "The multiplier of 4.5 requested by Petitioners will be applied to the lodestar fee despite the facts that such a multiplier is extremely high and appears to be probably without precedent. It is warranted only because of the peculiar facts of this case." *Id.* at 1000.

expenses and costs in the prosecution of claims and in obtaining settlement, including expenses incurred in connection with document productions, consulting with experts and consultants, travel and other litigation-related expenses.").

The Court also approves Plaintiffs' request for settlement administration costs to be paid from the settlement fund. *See* Newberg on Class Actions § 12:20 (5th ed.) ("[The] costs of paying the claims administrator, processing the claims, providing notice to the class, and generally administering the settlement is typically deducted from the settlement fund."). The administration costs, which covered notices and claim processing, will be at most $243,216 plus the cost of postage, which breaks down to under $1.50 per class member. This does not strike the Court as excessive. Indeed, counsel informs the Court that in selecting a settlement administrator, they sought "competitive bids from three reputable firms and determined that Epiq's bid was fair and reasonable." (R. 60, PID 1051.) Accordingly, up to $243,216 plus the cost of postage will be taken from the settlement fund to pay for administration.

Each of the named Plaintiffs in this case, Hillson, Bohler, and Schmidt ask this Court to award them $2,500 each for their efforts in prosecuting this case. (*See* R. 60, PID 932–35.)

In evaluating this request, the Court is mindful that large disparities between the awards offered to the named plaintiffs versus the other class members can render a settlement agreement unfair. In *Vassalle v. Midland Funding LLC*, 708 F.3d 747 (6th Cir. 2013), a debt collector was accused of using false affidavits to collect debts. *See id.* at 752. Under the class-action settlement, a named plaintiff's $4,500 debt was forgiven while class members received only $17 and were prevented from asserting that the affidavits were false in a future collection suit. *See id.* at 755–56. Despite finding that the district court had not abused its discretion in assessing the other fairness factors, the Sixth Circuit found that "this disparity in relief is so great that we

conclude the district court abused its discretion in finding that the settlement was fair, reasonable, and adequate." *Id.* at 755. Here, as in *Vassalle*, the disparity between Plaintiffs' requested award and the class members' recovery is very large. (This is discussed in detail below.) But the Court takes refuge in the fact that settlement was not contingent on the representative service payments, they were negotiated after settlement was reached, and the settlement agreement allows the Court to award a different amount than that requested by Plaintiffs. (R. 37, PID 521.)

That leaves the issue of the amount to award. As this Court previously explained, while representative service payments (or incentive awards, depending on the perspective) are not prohibited in the Sixth Circuit, our Court of Appeals has not endorsed them either. *See Underwood v. Carpenters Pension Tr. Fund-Detroit & Vicinity*, No. 13-CV-14464, 2017 WL 655622, at *11 (E.D. Mich. Feb. 17, 2017). "[T]o the extent that incentive awards are common, they are like dandelions on an unmowed lawn—present more by inattention than by design. And we have expressed a sensible fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 722 (6th Cir. 2013) (internal quotation marks and alteration omitted). Thus, "[t]o ensure that these amounts are not in fact a bounty . . . counsel must provide the district court with specific documentation—in the manner of attorney time sheets—of the time actually spent on the case by each recipient of an award." *Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 311 (6th Cir. 2016).

Here, counsel has not provided the Court with documentation of the time Plaintiffs spent on this case. Counsel states that they did not know to track Plaintiffs' time because *Shane* had not been decided when they initiated this case. (R. 60, PID 935.) That's fair. But at oral

13

argument, counsel was not able to provide the Court with an estimate of the time Plaintiffs' spent on this case. And Plaintiffs' affidavits in support of their representative payments indicate that they simply performed the tasks plaintiffs pursuing a case usually perform—perhaps at a slightly greater level of involvement than if they had filed their own suits. (*See* R. 64, 65, 66.)

Aside from documentation, the Court is concerned about the size of the representative service payments as compared to Plaintiffs' recovery had they brought their own lawsuit and as compared to other class members' recovery. If Plaintiffs had brought their own stand-alone disclosure lawsuit (and succeeded), their recovery would have been around $100 each. Yet, if the Court approves their request, they will receive $2,500. Notably too, those in the "Adjudicated Ineligible" group (of which Plaintiffs are not a part) will receive around $217 while other class members will received around $72. Plaintiffs' requested representation payments are still over 10 and 30 times greater than what their fellow class members will recover, respectively.

As such, the Court will not award Plaintiffs $2,500 each from the settlement fund. *See Dry Max Pampers*, 724 F.3d at 722 ("[W]e should be most dubious of incentive payments when they make the class representatives whole, or (as here) even more than whole; for in that case the class representatives have no reason to care whether the mechanisms available to unnamed class members can provide adequate relief."). Instead, the Court will award Hillson, Bohler, and Schmidt each $1,200 for their services in this case. This amount is more than the maximum they would have recovered had they brought their own FCRA suit (and won it). *See* 15 U.S.C. § 1681n(a)(1)(A). Further, the Court believes that this amount fairly compensates Plaintiffs for their efforts in this litigation, accounts for the possibility that this suit could impact their future employment opportunities, and adequately incentivizes others to serve as class representatives in like cases.

Having considered all the factors that bear on the fairness of the settlement, the Court will grant final approval. In addition to the factors discussed in the preliminary approval opinion, *Hillson*, 2017 WL 279814, at *6–14, the Court finds that the reaction of the class members indicates that the settlement is fair and that—once adjusted—the settlement fairly awards attorney's fees, costs, administration expenses, and class representative payments.

The Court also finally certifies the class for purposes of settlement. The Court's preliminary approval opinion discussed the Rule 23(a) and Rule 23(b)(3) considerations at length, *Hillson*, 2017 WL 279814, at *14–18, and nothing between then and now adversely affects that prior analysis.

Given the foregoing, the Court hereby ORDERS as follows:

1. The settlement agreement (R. 37-2) including its exhibits (the "Settlement Agreement"), and the definition of words and terms contained therein, are incorporated by reference in this order. The terms of this Court's preliminary approval order, *see Hillson v. Kelly Servs. Inc.*, No. 2:15-CV-10803, 2017 WL 279814, at *18–19 (E.D. Mich. Jan. 23, 2017), are also incorporated by reference in this order.

2. This Court has jurisdiction over the subject matter of the Action and over the Parties, including all members of the following Settlement Class certified for settlement purposes:

> All persons on whom Defendant procured a consumer report pursuant to the Fair Credit Reporting Act during the period from July 18, 2012 through January 23, 2014, and whose initial hire date with Defendant was during the period of time when Defendant was providing new applicants with a disclosure form that contained a liability release.

3. The Court hereby finds that the Settlement Agreement is the product of arm's length settlement negotiations among the Named Plaintiffs, Class Counsel and Defendant. The Court

further finds that counsel for the Parties are experienced class action lawyers who vigorously asserted the positions of their respective clients.

4. The Court hereby finds and concludes that notice was disseminated to members of the Settlement Class in accordance with applicable law, as well as the terms set forth in the Settlement Agreement in compliance with this Court's preliminary approval order.

5. The Court further finds and concludes that the notice and settlement award distribution procedures set forth in the Settlement Agreement fully satisfy Federal Rule of Civil Procedure 23 and the requirements of due process, were the best notice practicable under the circumstances, provided individual notice to all members of the Settlement Class who could be identified through reasonable effort, and support the Court's exercise of jurisdiction over the Settlement Class as contemplated in the Settlement and this order.

6. This Court hereby finds and concludes that the notice provided by Defendant to the appropriate state and federal officials pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1715, fully satisfied the requirements of that statute.

7. The Court hereby finally approves the Settlement Agreement and the Settlement contemplated thereby, and finds that the terms and conditions constitute, in all respects, a "fair, reasonable and adequate" settlement as to all Settlement Class Members in accordance with Federal Rule of Civil Procedure 23(e), and directs its consummation pursuant to its terms and conditions and the terms and conditions of this order.

8. The Court finds that this Settlement is in good faith and, by this order, hereby bars possible future indemnity and contribution claims against Defendant related to or arising from the claims alleged in the Amended Complaint by non-parties to this Action.

9. The Court reserves jurisdiction over all matters arising out of the Settlement Agreement.

10. The Court approves Class Counsel's application for $1,454,206.52 in attorney's fees and $40,864.60 in out-of-pocket litigation expenses, and for a service award to Plaintiffs Hillson, Bohler, and Schmidt in the amount of $1,200 each. The Court also approves the payment of up to $243,216 plus the cost of postage to the Settlement Administrator. These amounts shall be paid from the Maximum Settlement Amount.

11. This Court hereby dismisses this Action and all claims with prejudice, without costs to any party, except as expressly provided for in the Settlement Agreement and this order.

12. The Court further finds that all members of the Settlement Class, except those individuals who exercised their right to opt out of the Settlement, are hereby barred from suing Defendant as to any of the claims released by the Settlement. As a result, such members of the Settlement Class fully release Defendant from any and all claims the Settlement Class has arising out of or relating directly or indirectly in any manner whatsoever to the facts alleged or asserted in the Complaint and Amended Complaint and which relate directly or indirectly in any manner whatsoever to Defendant's procurement of consumer reports, including but not limited to any and all claims under 15 U.S.C. §§ 1681b(b)(1), 1681b(b)(2) and 1681b(f) of the Fair Credit Reporting Act and any analogous state law claims (collectively, the "Settlement Class Member Released Claims"). (R. 49, PID 776–77.) This release explicitly includes claims for actual damages, statutory damages, and punitive damages, as well as for attorney's fees and costs, relating to the Settlement Class Member Released Claims.

13. The Court orders that this final approval order and forthcoming separate judgment shall constitute a final judgment pursuant to Federal Rule of Civil Procedure 54 that is binding on the Parties and the Settlement Class.

SO ORDERED.

                                               s/Laurie J. Michelson
                                               LAURIE J. MICHELSON
Dated: August 11, 2017                   U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 11, 2017.

                                               s/Keisha Jackson
                                               Case Manager

# Appendix

1. *Merkner v. AK Steel Corp.*, 1:09-cv-00423-TSB, ECF No. 79, at 6–7 (S.D. Ohio Jan. 10, 2011) (awarding fees equivalent to a multiplier of 5.3, but fee award was only 10% of $91 million fund)
2. *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. CIV.A. 05-11148PBS, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (awarding fees equivalent to a multiplier of 8.3, but fee award was only 20% of $350 million fund)
3. *In re Cardinal Health Inc. Sec. Litigations*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) (awarding fees equivalent to a multiplier of 6, but fee award was only 18% of a $600 million fund)
4. *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. CIV.A. 03-4578, 2005 WL 1213926, at *18 (E.D. Pa. May 19, 2005) (awarding fees equivalent to a multiplier of 15.6, but fee award was only 20% of $100 million fund and none of the 90 class members—all sophisticated business—had objected to fees of 33%)
5. *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 590 (E.D. Pa. 2005) (awarding fees equivalent to a multiplier of 6.96, but fee award was only 25% of $126 million fund and "plaintiffs' counsel obtained a historic recovery for the class in a rare and complex kind of case where victory at trial would have been, at best, remote and uncertain")
6. *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (awarding fees equivalent to a multiplier of 5.5, but fee award was only 17% of $115 million fund and "the result achieved was one that captured national attention and focused upon the importance of private attorneys general in enforcement of the proscriptions against racial discrimination in the workplace")
7. *Willson v. N.Y. Life Ins. Co.*, Index No. 94/127804, 1995 N.Y. Misc. LEXIS 652, at *94-95 (Sup. Ct. Nov. 8, 1995) (awarding fees equivalent to a multiplier of 4.6, but fee award was only 7% of $300 million fund)
8. *In re RJR Nabisco, Inc. Sec. Litig.*, No. 818 (MBM), 1992 WL 210138, at *5 (S.D.N.Y. Aug. 24, 1992) (awarding fees equivalent to a multiplier of 6, but fee award was only 24.3% of $72.5 million fund and court conducted no analysis as to whether multiplier of 6 was in line with any other case)
9. *Cosgrove v. Sullivan*, 759 F. Supp. 166, 167 n.1, 169 (S.D.N.Y. 1991) (awarding fees equivalent to a multiplier of nearly nine, but fee award was only 1% of expected class recovery of $100,000,000)
10. *In re Fernald Litig.*, No. C-1-85-149, 1989 WL 267038, at *1–2, *5 (S.D. Ohio Sept. 29, 1989) (awarding fees equivalent to a multiplier of 5, but fee award was only 20% of $73 million fund, counsel persisted through motions for decertification, summary judgment, and a summary jury trial, and case was the first challenging a government contractor's operation of a nuclear power plant)